In the
United States Court of Appeals
For the Seventh Circuit

Nos.  97-3132, 97-3159, 97-3163, 97-3480,
97-3666, 97-3683, 97-3697, 98-1066,
98-1265, 98-1310, 98-1981,
98-1991, 98-2362, 98-3115 & 98-3625

United States of America,

Plaintiff-Appellee,

v.

Andrew ("Bay-Bay") Patterson, Robert Patterson,
Henry Patterson, Andrew L. ("Maine") Patterson,
Tyrone Williams, Andre Williams, Durwin Baker,
Terry Clark, Willie Connor, Maurice Foster,
Gregory Hubbard, Jerry Patterson, Lennell
Patterson, Odell Sumrell, and Edgar Williams,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern
Division.
No. 95 CR 242--Robert W. Gettleman, Judge.

Argued February 15, 2000--Decided June 1, 2000

Before Posner, Chief Judge, and Easterbrook
and Diane P. Wood, Circuit Judges.

Easterbrook, Circuit Judge.  Fifteen
defendants appeal their convictions for
drug-related offenses. Four of their
confederates pleaded guilty and testified
for the prosecution at the 20-week trial.
More evidence came from tape recordings
of incriminating conversations. The jury
was entitled to conclude that all 15
appellants were affiliated with the
Traveling Vice Lords street gang. Andrew
"Bay-Bay" Patterson, one of the gang's
"five-star universal elites," was
defendants' leader. We use the street
name "Bay-Bay" because eight Pattersons
were among the defendants, and Bay-Bay's
nephew "Maine" Patterson shares the given
name "Andrew." Bay-Bay supplied the
drugs, while his brothers Robert and
Henry supervised their distribution. The
operation lasted at least a decade and

during its best years grossed more than $40,000 a day in retail sales. Sentences are correspondingly high: the shortest term for any appellant is 210 months' imprisonment, and three of the appellants, including Bay-Bay and Robert, were sentenced to life imprisonment. Because the arguments presented on appeal are self-contained, we omit further details.

I

The district court used a struck-jury system to select the jurors. Members of the venire were screened, and some were excused for cause, until the court had a pool large enough to seat a jury and alternates, taking account of peremptory challenges. In a criminal case the defense is entitled to 10 challenges and the prosecution 6, Fed. R. Crim. P. 24(b), plus up to 3 more to be exercised against alternates, Rule 24(c)(2), and in a multi-defendant case the district court may award extra challenges. It did so here, granting the defendants (collectively) 20 and the prosecutor 12, plus 2 apiece for alternates. Because the judge planned to seat 12 jurors and 8 alternates, the pool had to contain 56 persons, to ensure that if all peremptory challenges were exercised (and the prosecution and defense never challenged the same person) 20 persons would be left. After the initial screening for cause, 63 members of the venire remained, and the district judge put all 63 into the pool for the exercise of peremptory challenges (and any belated challenges for cause). The judge decided not to establish a priority within this pool. All 63 had an equal chance of serving. After peremptory challenges were exercised, some adjustments were made (the judge granted additional challenges because some strikes overlapped), and 31 persons remained, the clerk shuffled the juror cards and drew 12 to be the jurors. Then each side exercised 2 challenges against the residual pool of 19, the clerk shuffled the remaining cards, and 8 alternates were drawn.

Defendants objected to this procedure (and to avoid parsing who objected to what, we treat everyone as objecting to everything). They wanted to know the sequence in which members of the pool would be called to sit on the jury, so

that they could concentrate their challenges on those persons most likely to serve. As the district court organized matters, however, every member of the pool was equally likely to sit, so the defense could not target challenges strategically. Moreover, the extra members in the pool diluted the utility of each challenge by the ratio 56/63. The 20 challenges that the defendants initially were allotted had the same practical effect with a 63-person pool as 18 challenges would have had with a 56-person pool. The pool's extra size effectively deducted 2 challenges.

All members of the jury actually seated in the case were impartial. Still, defendants insist that the convictions must be reversed, because they were unable to make the best of their peremptory challenges. As defendants see it, the district judge committed at least four errors in the jury-selection process:

The court created a pool of 63 venire members, instead of the 56 that would exactly equal the number of jurors needed plus the number of challenges. United States v. Ricks, 802 F.2d 731, 737 (4th Cir. 1986) (en banc), declared that excess membership in a struck-jury pool always is reversible error unless the judge unequivocally reveals the order of selection from the pool.

The judge did not list the pool's members in order, which defeated defendants' efforts to target the persons who were most likely to serve. United States v. Underwood, 122 F.3d 389 (7th Cir. 1997), held that a related deficit of information about the order in which jurors would emerge from the pool always is reversible error.

Although Fed. R. Crim. P. 24(c)(1) provides that a "court may empanel no more than 6 jurors, in addition to the regular jury, to sit as alternate jurors," the district judge decided to select 8 alternates. This diluted the effectiveness of the peremptory challenges

available to remove potential alternate jurors.

Although Fed. R. Crim. P. 24(c)(2) provides that defendants receive 3 additional peremptory challenges when the district judge seats 5 or 6 alternates, the judge in this case allowed only 2 extra challenges for 8 alternates--a 1-to-4 ratio, instead of Rule 24(c)'s 1-to-2 ratio.

None of these events calls into question the impartiality of the jury eventually selected, which makes it hard to see why there is any real problem. United States v. Martinez-Salazar, 120 S. Ct. 774 (2000), decided after Ricks and Underwood (the cases on which defendants principally rely), stresses that peremptory challenges have served their purpose when the jury finally selected is impartial. Martinez-Salazar rejects any argument that a party is entitled to devote all peremptory challenges to strategic use such as eliminating unbiased jurors who a party believes may (perhaps because of their open minds) favor the other side. A peremptory challenge devoted to removing a juror who should have been disqualified for cause is not, the Court held, equivalent to depriving the party of a peremptory challenge; instead this is one common and proper use of a challenge. Here, as in Martinez-Salazar, the defendants had the prescribed 10 challenges; indeed they had twice that, and if the overflow of the pool meant that they had an equivalent of "only" 18 challenges, that was plenty.

What led to reversal in Underwood was an ambiguity in the district judge's jury-selection protocol that led the defendants to misunderstand the sequence in which members of the pool would be seated on the jury. That misunderstanding led the defendants not to challenge two persons who they thought were so far back in the order that they were unlikely to be seated, but who actually served. If an ambiguity that affected two challenges is reversible error, then failure to establish any sequence, a step that potentially affected all 20 challenges, must be error too. However logical that argument may be, Underwood is no longer authoritative after Martinez-Salazar. Our

views in Underwood reflected the belief that defendants are entitled to make maximum strategic use of their peremptory challenges. That same conception of defendants' entitlements led the ninth circuit to hold that "losing" a peremptory challenge in order to remove a juror who should have been excused for cause is reversible error. United States v. Martinez-Salazar, 146 F.3d 653 (9th Cir. 1998). But the Supreme Court took a different tack, observing that Martinez-Salazar did not lose a peremptory challenge but instead used it "in line with a principal reason for peremptories: to help secure the constitutional guarantee of trial by an impartial jury." 120 S. Ct. at 782. Just so here. Defendants received their allotment of 10, and to spare. They had full use of all challenges for the purpose of securing an impartial jury. That defendants could not use them to maximum strategic advantage seems to us a benefit rather than a problem.

Formally, at least, the district judge's handling of alternates is more problematic. Rule 24(c)(2) grants 3 extra challenges for 6 alternates; the district judge allowed 2 extra challenges for 8 alternates. This looks like a reduction in the number of challenges provided by the rule, something that did not happen in Martinez-Salazar. Appearances may deceive, because everyone in the pool of potential alternates had passed the first wave of peremptory challenges. Any extra challenges provided for the selection of alternates meant that the defendants (and the prosecutor) had a higher ratio of challenges to alternates than of challenges to principal jurors. Rule 24(c)(2) assumes that jurors will be selected either by the jury-box system or by a struck-jury method in which defendants know the sequence in which members of the pool will be seated. When the sequence is known, defendants concentrate their challenges on venire members at the front of the queue; Rule 24(c)(2) provides extra challenges for the selection of alternates because otherwise defendants might have no peremptories left when the time arrives to pick alternates. Because the peremptory challenges exercised against the pool of 63 were as likely to excuse would-be alternates as to excuse would-be regular jurors, there was no need for a

second allotment of challenges. But the Rule provides for them anyway, and it was violated. Defendants argue for automatic reversal. Once again Martinez-Salazar leads to a different approach.

Underwood drew its rule of automatic reversal from the statement in Swain v. Alabama, 380 U.S. 202, 219 (1965), that "[t]he denial or impairment of the right [to peremptory challenge] is reversible error without a showing of prejudice." Underwood, 122 F.3d at 392. Relying on Ross v. Oklahoma, 487 U.S. 81 (1988), the prosecutor argued that harmless-error analysis applies to problems concerning peremptory challenges. We replied, 122 F.3d at 392: "Ross does not authorize us to abandon the automatic reversal rule that the Supreme Court announced in Swain where, as here, a denial or impairment of a defendant's statutory right to the intelligent exercise of peremptory challenges is found." Underwood thus relies entirely on Swain for the rule of automatic reversal. Martinez-Salazar, however, had this to say on the subject:

Relying on language in Swain v. Alabama, 380 U.S. 202 (1965), as did the Court of Appeals in the decision below, Martinez-Salazar urges the Court to adopt a remedy of automatic reversal whenever a defendant's right to a certain number of peremptory challenges is substantially impaired. Brief for Respondent 29 (quoting Swain, 380 U.S., at 219 (a "'denial or impairment of the right [to exercise peremptory challenges] is reversible error without a showing of prejudice'")). Because we find no impairment, we do not decide in this case what the appropriate remedy for a substantial impairment would be. We note, however, that the oft-quoted language in Swain was not only unnecessary to the decision in that case--because Swain did notaddress any claim that a defendant had been denied a peremptory challenge--but was founded on a series of our early cases decided long before the adoption of harmless-error review.

120 S. Ct. at 782 n.4. Martinez-Salazar did not decide the harmless-error question, but this language pulls the

plug on the Swain dictum and requires us to address the harmless-error question as an original matter.

Peremptory challenges come from Rule 24, and Rule 52(a) adds: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." See also 28 U.S.C. sec.2111. Martinez-Salazar makes it clear that peremptory challenges do not have an independent constitutional source; their provenance is statutes and rules. 120 S. Ct. at 779. See also Ross, 487 U.S. at 88. Rule 52(a) says that deviation from the rights established by Rule 24 and other provisions of the Rules of Criminal Procedure leads to reversal only if the error affects "substantial rights". Errors much more serious than the loss of a peremptory challenge or two are analyzed under this standard. E.g., Neder v. United States, 527 U.S. 1 (1999) (omission from jury instructions of an element of the offense); Jones v. United States, 527 U.S. 373 (1999) (inclusion of improper aggravating factor in a capital case); United States v. Lane, 474 U.S. 438 (1986) (misjoinder). See also, e.g., Peguero v. United States, 526 U.S. 23 (1999); Bank of Nova Scotia v. United States, 487 U.S. 250 (1988); United States v. Hasting, 461 U.S. 499 (1983). Rule 52(a) requires us to undertake harm less-error analysis.

Defendants respond that an error concerning a peremptory challenge always affects a "substantial" right. A right is "substantial" when it is one of the pillars of a fair trial. Trial before an orangutan, or the grant of summary judgment against the accused in a criminal case, would deprive the defendant of a "substantial" right even if it were certain that a jury would convict. Sullivan v. Louisiana, 508 U.S. 275, 279 (1993). For the same reason, a biased tribunal always deprives the accused of a substantial right. Bracy v. Gramley, 520 U.S. 899 (1997). See also Gomez v. United States, 490 U.S. 858, 876 (1989) (decision by an unauthorized tribunal deprives the defendant of a substantial right). Deprivation of counsel likewise so undermines the ability to distinguish the guilty from the innocent that it always leads to reversal. See United States v. Cronic, 466 U.S. 648, 658-59 (1984); Castellanos

v. United States, 26 F.3d 717 (7th Cir. 1994). But "if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis." Rose v. Clark, 478 U.S. 570, 579 (1986). It is impossible to group an error concerning peremptory challenges with the denial of counsel or trial before a bribed judge. When the jury that actually sits is impartial, as this one was, the defendant has enjoyed the substantial right. Peremptory challenges enable defendants to feel more comfortable with the jury that is to determine their fate, but increasing litigants' comfort level is only one goal among many, and reduced peace of mind is a bad reason to retry complex cases decided by impartial juries.

McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548 (1984), makes the point. A juror's failure to respond to a question on voir dire deprived a party of information that would have been useful in exercising a peremptory challenge. Relying on 28 U.S.C. sec.2111 and Fed. R. Civ. P. 61, a civil analogue to Rule 52(a), the Court concluded that reversal would not be justified unless a correct response by the juror "would have provided a valid basis for a challenge for cause." 464 U.S. at 556. The Court recognized the importance of information to the intelligent exercise of peremptory challenges but concluded that "[t]he harmless-error rules adopted by this Court and Congress embody the principle that courts should exercise judgment in preference to the automatic reversal for 'error' and ignore errors that do not affect the essential fairness of the trial." Id. at 553. Although McDonough is a civil case, its essential principle is applicable to criminal cases as well.

In any given situation there remains the possibility that a blunder affects a right that is substantial in the sense of Kotteakos v. United States, 328 U.S. 750 (1946): that it "had substantial and injurious effect or influence in determining the jury's verdict". 328 U.S. at 776. See also United States v. Olano, 507 U.S. 725, 734-35 (1993). An exceptionally confused jury-selection process may have such an effect. (Thus we

do not say that the result in Underwood was necessarily wrong, only that its resort to a rule of automatic reversal is incompatible with Rule 52.) In a trial like this, however, the possibility that an error altered the outcome is too remote to be worth investigating. One or two extra peremptory challenges to remove additional members of a panel that already had been subject to 22 peremptory challenges by the defense could not have affected the outcome of the case. This was a well-screened panel, and the jury that sat was impartial. Doubtless it will often be impossible to show that a change in the number of peremptory challenges affected the outcome of a trial--but inability to trace adverse effects to a mistake does not justify reversing a conviction; it shows instead that there is no warrant for disturbing the judgment. United States v. Morrison, 449 U.S. 361 (1981).

II

Customers were reluctant to approach defendants' distribution outlets while police were visible. Officer Robert Drozd, in particular, gave the operation trouble. One day in 1991 Drozd, seeing more than 30 cars queued up for service at the gang's "spot," began waving the drivers to get under way. Henry Patterson complained: "Bob, you're killing us." When Drozd feigned ignorance about the meaning of this comment and the purpose of the cars in the street, Henry offered: "Can we do something?" Again Drozd played dumb, and Henry continued: "Well, can I give you a gun?" Drozd agreed to this bribe, and 20 minutes later he was directed to an alley from which he retrieved a sawed-off shotgun. Thus began a course of dealing in which Drozd caused trouble, one or more of the defendants offered a gun, and after picking up his reward Drozd left. Usually the Pattersons told Drozd where to find a weapon, but sometimes a hand-to-hand exchange was made. Drozd reported these bribes to federal officials. Nine of the 15 appellants were involved in the guns-for-protection deals and were convicted of violating 18 U.S.C. sec.924(c)(1), which makes it a crime to use or carry a firearm during and in relation to a drug trafficking offense.

Bailey v. United States, 516 U.S. 137

(1995), holds that a gun is "used" within the meaning of sec.924(c)(1) only when it is employed actively, as by shooting it or waiving it about to intimidate people. Simple possession differs from "use," Bailey concludes. (Section 924(c) has since been amended; we refer to the version in force when these events occurred.) Defendants insist that leaving guns for Drozd to "find" is not sufficiently active to qualify as "use" under sec.924(c)(1). But they don't reckon with Smith v. United States, 508 U.S. 223 (1993), which holds that the exchange of a gun for drugs is a "use" of the gun within the meaning of sec.924(c)(1). Bailey gave the transaction in Smith as an example of a sufficiently active employment of a weapon. 516 U.S. at 143. We can't see any difference between gun-for-drugs (held sufficient in Smith) and gun-for-protection (the situation here). In each case the gun's owner has bartered the weapon for a drug-related benefit--either drugs (in Smith) or a continued ability to sell drugs (our case). Bribing an officer with a gun in order to go on selling drugs is a use of the gun "during and in relation to" the drugs' distribution. Defendants rely on United States v. Westmoreland, 122 F.3d 431, 435-36 (7th Cir. 1997), which held that accepting a gun in exchange for drugs does not violate sec.924(c)(1), even though per Smith accepting drugs in exchange for a gun does. Perhaps the transaction in Westmoreland was best understood as using drugs during and in relation to a firearms offense. Using drugs as currency to buy guns does not "use" the guns. But by bribing Drozd with guns, the defendants actively used firearms during and in relation to their drug business.

III

Timothy S. Hearst, who represented Robert Patterson at trial, was not reliable. Many days he was late; others he did not appear at all. He missed seven days of Drozd's testimony, four of five sessions of the jury instruction conference, most of the other defendants' closing arguments, and proceedings to address notes from the jury during deliberations. He had a short legal career; admitted to practice in 1992, Hearst was disbarred in March 1999 for

neglecting cases and converting clients' funds. But in post-trial proceedings, the district court concluded that Hearst furnished Robert with effective assistance of counsel--first because Hearst vigorously cross-examined the prosecution's witnesses and mounted a plausible defense (that there were multiple conspiracies and that Robert did not join the single conspiracy charged in the indictment), and second because it was impossible to show prejudice given the strength of the prosecution's evidence. The hearing on Hearst's conduct spanned three days. Rare is the claim of ineffective assistance that can be evaluated intelligently on direct appeal, but, because Robert's contentions have received the district judge's full consideration on a record the parties agree is complete, they are properly before us now. Guinan v. United States, 6 F.3d 468 (7th Cir. 1993). Moreover, the parties have agreed, in memoranda filed after the oral argument, that a remand for further hearings is not necessary or appropriate. We must evaluate Robert's contentions on the record as it stands.

Abandoning any argument that he suffered prejudice from Hearst's performance, Robert advances the more promising contention that for extended portions of the trial he just did not have any lawyer--and that deficiency violates the sixth amendment even if the defendant cannot establish a likely effect on the outcome. Satterwhite v. Texas, 486 U.S. 249, 256 (1988); United States v. Cronic, 466 U.S. 648, 658-59 (1984); United States v. Russell, 205 F.3d 768 (5th Cir. 2000). Cf. Roe v. Flores-Ortega, 120 S. Ct. 1029, 1038 (2000). To this the prosecutor responds that Robert always had counsel--though not always Hearst. Lawyers representing the other defendants stood in for Hearst while he was awol. If Robert consented to this switch in representation, then he had a lawyer throughout the proceedings and cannot invoke the abandonment principle.

But did he consent? Here is an exchange that the parties agree is typical:

THE COURT: Good morning, everyone. Please be seated. Everybody here, ready to go?

MR. PILOLLA: Mr. Hearst is not

here. I am standing in for him.

THE COURT: Who is it?

MR. PILOLLA: Mr. Hearst.

THE COURT: Mr. Hearst. You are standing in for him, Mr. Pilolla?

MR. PILOLLA: I am.

MS. MURDOCK: Does his client waive his presence?

THE COURT: Does Mr. Hearst's client waive his presence? Mr. Patterson?

DEFENDANT R. PATTERSON: Yes.

THE COURT: Thank you, sir.

The district judge did not ask Robert what he understood by "waiv[ing Hearst's] presence"--in particular, the judge did not inquire whether Robert understood the other options, and understanding one's options is an essential ingredient of waiver when the right at stake is counsel. See Johnson v. Zerbst, 304 U.S. 458 (1938). On another occasion the judge asked Robert whether he had "any objection" to "being represented by Mr. Aron" when Hearst was not present; Robert replied "Yeah, it's okay." The judge's abbreviated inquiries would have been adequate if Hearst's absences had been few or brief; virtual representation is common and proper in extended, multi-defendant trials. See United States v. Jackson, 207 F.3d 910, 918-19 (7th Cir. 2000). But Hearst's absences were too common and too lengthy for the normal stand-in approach. What happened looks more like a partial substitution of counsel, or the appointment of co-counsel to assist Hearst, and such steps require additional care. Did Robert know that he had other options? If Robert believed that the only alternative to proceeding with Pilolla, Aron, or other defendants' lawyers was proceeding with no lawyer at all for extended portions of the trial, then the waiver is ineffectual. See United States v. Morrison, 946 F.2d 484, 502 n.4 (7th Cir. 1991). If, however, Robert knew that he had a right to his own lawyer--that is, to delay the trial until Hearst arrived or another lawyer was appointed in his stead and prepared to proceed as his advocate--then the

waiver was informed, and Robert cannot complain that he was unrepresented even momentarily.

Unfortunately the district court did not make the essential inquiry at trial, and in the post-verdict proceedings the prosecutor chose to let the issue slide. Counsel asked Robert: "Do you have an understanding as to what would happen if you didn't agree to these other lawyers standing in for your case?" Robert answered "No, sir." and the prosecutor did not follow up by cross-examination. Resources were at the prosecutor's disposal. The district judge remarked when denying Robert's motion for a new trial that although Robert often had to make do with a stand-in, on "other occasions when Mr. Hearst believed that he wasn't feeling well enough to carry on, we recessed the trial. It was late in the trial. At that point I was not going to declare a mistrial with respect to Mr. Patterson. I would rather have waited until Mr. Hearst felt better, which is exactly what we did." This implies that Robert had actual knowledge of his option to delay the trial until Hearst returned--though perhaps the fact that the judge did not take this step until "late in the trial" means that Robert was uninformed when he consented earlier. But we need not pursue this subject, because the prosecutor did not pursue it. The United States allowed Robert's answer to stand unchallenged; we must assume that he did not know his options.

To say that Robert had the right to counsel does not necessarily mean that an irresponsible lawyer (or the defendant's ignorance of his entitlements) may bring a complex trial to a halt or force a severance. Hearst had been appointed, and the district judge could have elected to appoint a co-counsel or relieve him altogether. Perhaps that is the best way to understand what happened: the district court appointed some of the other defense lawyers as co-counsel for Robert. A defendant could not block that step just by saying that he preferred Hearst; when a court appoints counsel, it need not choose the lawyer the defendant prefers. Morris v. Slappy, 461 U.S. 1 (1983). Once again, however, the record does not reveal information that is essential to evaluating the propriety of appointing co-counsel (if that is the best way to

understand matters). Other defendants'
lawyers could not represent Robert if
that would have created a conflict of
interest with their own clients. See
Wheat v. United States, 486 U.S. 153,
159-62 (1988). The district court did not
explore the question whether conflicts
existed or invite waivers (from Robert
and other defendants; all clients would
have to consent under the circumstances).
See United States v. Roth, 860 F.2d 1382
(7th Cir. 1988) (holding that defendants
may waive the entitlement to conflict-
free counsel, provided the waiver is
intelligent). Nor did the judge ask
whether the other lawyers were pursuing a
sensible defense strategy for Robert. If
to other defense lawyers "standing in"
for Hearst meant only defending their own
clients' interests and reporting to
Hearst at day's end what had transpired,
then again Robert was effectively
unrepresented.

   According to the memorandum the United
States filed after oral argument, Robert
forfeited any entitlement to protest the
absence of an inquiry into conflicts (or
the way other lawyers understood their
obligation to protect Robert's interests)
by not presenting evidence on these
points at the hearing. That puts the
burden in the wrong place. A judge who
effectively appoints one lawyer to serve
two clients must initiate inquiry on his
own, see Russell, as the judge in this
trial did not. Belated inquiry could have
shown that the omission at trial was
harmless, because there was no conflict,
but the prosecutor did not raise the
subject at the hearing. Nor do we think
it possible to say that Robert forfeited
the entire subject--not only because
Hearst's absences were a major component
of Robert's motion for a new trial (which
should have alerted the prosecution to
the need to develop evidence about
possible conflicts) but also because the
United States did not argue forfeiture in
its appellate brief. It raised forfeiture
for the first time in the memorandum
submitted after argument, and by that
delay it forfeited any right to assert
Robert's potential forfeitures at an
earlier stage.

   One final possibility requires brief
consideration. A defendant is entitled to
counsel only at critical stages in the
prosecution against him. If nothing that

occurred during Hearst's absences was relevant to the charges against Robert, then perhaps he has not suffered a loss of counsel during a critical stage. Once again, however, this possibility has been forfeited by the United States--perhaps because it is so obvious that all of the evidence presented in a conspiracy prosecution counts against every defendant. We agree with the fifth circuit's conclusion in Russell that when the defendant's lawyer skips multiple days of a trial at which his client is accused of conspiring with other defendants, the accused does not effectively waive his right to counsel (or consent to vicarious representation by other defendants' lawyers), and the judge does not take the steps necessary to appoint replacement counsel or add co-counsel, the judgment must be set aside without any inquiry into prejudice.

IV

Tyrone Williams was acquitted of the only firearms charge brought against him, and he contends that this acquittal perversely increased his sentence. Calculated without regard to any firearms adjustments, Williams' sentence would have been in the range for offense level 41 and criminal history category VI. That range is 360 months to life. Had he been convicted of the weapons charge, a minimum of 60 months (which must run consecutively) would have been added, for a final sentencing range of 420 months to life. Because he was acquitted of "using or carrying" a gun, however, the district judge had to ask whether Williams or one of his partners in crime possessed a gun, a lower standard under U.S.S.G. sec.2D1.1(b)(1) than Bailey sets for conviction under sec.924. See United States v. Carmack, 100 F.3d 1271, 1279-80 (7th Cir. 1996). Possession of a dangerous weapon during the offense leads to two extra levels, "unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. sec.2D1.1 Application Note 3. The district judge found by a preponderance of the evidence that Williams and many co-conspirators possessed firearms, and Williams did not establish to the judge's satisfaction that the guns were unconnected to the offense. That finding put Williams at offense level 43, and the guideline "range" for that level has only one entry: "life." Yet under U.S.S.G.

sec.2K2.4 Application Note 2, a conviction on the sec.924(c) charge would have precluded a two-level enhancement under sec.2D1.1(b)(1), in order to avoid double counting. This sets up Williams' protest. What sense can it make to have a sentencing range of 420 months to life for a person convicted of using or carrying a gun during and in relation to a drug offense, and a mandatory sentence of life if the person is acquitted of that charge?

Perhaps this is an appearance without substance. For many people, a sentence of 420 months (35 years) and a sentence of life imprisonment come to the same thing, given the defendant's age at the time of conviction. For young defendants, however, there may be a practical difference when the criminal behavior leads to a high offense level. Section 2K2.4 Application Note 2 establishes a sensible rule for the vast majority of defendants, because the mandatory five-year-minimum for a violation of sec.924(c) exceeds the effect of two offense levels. But when the offense level reaches 32 (at criminal history level VI) a two-level increase can lead to a more severe punishment than the minimum possible sentence under sec.924(c)(1).

The Constitution does not guarantee a completely rational system of sentencing. See, e.g., Chapman v. United States, 500 U.S. 453, 466-68 (1991); Neal v. United States, 516 U.S. 284 (1996). Unlike the situation in Chapman and Neal, however, Williams has not been caught by a statutory minimum sentence that causes a less culpable person to be punished more severely. His punishment depends wholly on the Sentencing Guidelines, and Congress has provided an escape hatch for unusual situations: departure under 18 U.S.C. sec.3553(b). See Koon v. United States, 518 U.S. 81 (1996). The Sentencing Commission recognized that the anti-double-counting norm could lead to sentencing inversions--that is, to more culpable persons receiving lower sentences, see United States v. Brigham, 977 F.2d 317 (7th Cir. 1992)--and invited departures by sec.2K2.4 Application Note 2, which we now set out in full:

Where a sentence under this section is imposed in conjunction with a

sentence for an underlying offense, any specific offense characteristic for the possession, use, or discharge of an explosive or firearm (e.g., sec.2B3.1(b)(2)(A)-(F) (Robbery)) is not to be applied in respect to the guideline for the underlying offense.

In a few cases, the offense level for the underlying offense determined under the preceding paragraph may result in a guideline range that, when combined with the mandatory consecutive sentence under 18 U.S.C. sec.844(h), sec.924(c), or sec.929(a), produces a total maximum penalty that is less than the maximum of the guideline range that would have resulted had there not been a count of conviction under 18 U.S.C. sec.844(h), sec.924(c), or sec.929(a) (i.e., the guideline range that would have resulted if the enhancements for possession, use, or discharge of a firearm had been applied). In such a case, an upward departure may be warranted so that the conviction under 18 U.S.C. sec.844(h), sec.924(c), or sec.929(a) does not result in a decrease in the total punishment. An upward departure under this paragraph shall not exceed the maximum of the guideline range that would have resulted had there not been a count of conviction under 18 U.S.C. sec.844(h), sec.924(c), or sec.929(a).

If the district judge would have given Williams a life sentence (one within the level 41 range without need for departure) had he been convicted of the firearms count, then the acquittal has not affected his sentence and he has no complaint. Similarly, the judge had discretion to avoid a sentencing inversion by departing downward. If, say, a conviction under sec.924(c) would have led the judge to select a sentence of 420 months for Williams (the bottom of the level 41 range, plus the consecutive 60 months), then perhaps the district court could have justified a downward departure to 400 months for simple possession (or being accountable for confederates' possession).

After reviewing the sentencing

proceedings, we are unsure whether the district judge understood the extent of his discretion under sec.3553(b). We therefore remand Williams' sentence so that the district judge may consider his options. If the judge believes that life imprisonment is the best punishment, one he would have meted out without regard to conviction under sec.924(c), then the sentence stands. If the judge would have given a lesser sentence for the combination of a level 41 offense and a sec.924(c) conviction, however, then the judge should consider whether it is appropriate to depart downward, so that Williams' term falls in the range between 360 months' imprisonment and the sentence the judge would have meted out had the jury convicted Williams of the sec.924(c)(1) charge. Because this is an unusual case, the district judge has discretion either way; but the record must reveal that he understands and exercises that discretion. When taking up the issue a second time, the district judge should think it through afresh, rather than adopting a presumption in favor of the existing sentence.

Other issues have been considered but do not require discussion. The principal omitted contention--that the kind and quantity of drugs must be treated as elements of the offense under 21 U.S.C. sec.841 in light of Jones v. United States, 526 U.S. 227 (1999)--has been resolved by an opinion issued after the oral argument of this case. See Jackson, 207 F.3d at 920-21. See also United States v. Edwards, 105 F.3d 1179 (7th Cir. 1997), affirmed, 523 U.S. 511 (1998). We cannot close, however, without expressing our appreciation to appellants' counsel for the care with which they unraveled the threads of this complex case and presented common issues in a joint brief.

The conviction of Robert Patterson is reversed, and his case is remanded for a second trial if the United States chooses to pursue that option. The conviction of Tyrone Williams is affirmed, but we vacate his sentence and remand for resentencing. All other judgments are affirmed.