In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-1648, 99-1922

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

CARL L. LEDFORD and
SHANE A. THOMAS,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Indiana, Fort Wayne
Division.
No. 97 CR 31--William C. Lee, Chief Judge.

ARGUED OCTOBER 25, 1999--DECIDED JUNE 27,
2000

   Before EASTERBROOK, MANION, and ROVNER,
Circuit Judges.

   ROVNER, Circuit Judge.  Carl Ledford and
Shane Thomas robbed a bank in Fort Wayne,
Indiana. Both men were armed, and in the
course of the robbery, Thomas injured
both a customer and a bank employee with
his handgun. Based upon a bystander's 911
call, the authorities were able to stop
the men's car as they attempted to make a
getaway. A brief inspection of the
automobile trunk revealed a firearm, a
bag full of cash, and other incriminating
evidence. A jury later convicted them of
committing bank robbery by force and
violence, or by intimidation, 18 U.S.C.
sec. 2113(a), and using a firearm during
and in relation to a crime of violence,
18 U.S.C. sec. 924(c). In calculating the
sentencing range for each defendant, the
district court found that they had
inflicted bodily injuries in the course
of the robbery, and that their offense
levels should be adjusted accordingly.
See U.S.S.G. sec. 2B3.1(b)(3)(A) (1998).
Ledford and Thomas now challenge both
their convictions and sentences, arguing
that the district court should have

suppressed the evidence discovered in the warrantless inspection of the car trunk and that in passing sentence the court improperly held them responsible for inflicting injuries on the bank patron and employee. We affirm.

I.

In the early afternoon of November 17, 1997, Ledford and Thomas backed a car up to the entrance of the Standard Federal Bank in the Waynedale section of Fort Wayne and walked into the bank. Both men carried handguns. Both were dressed in dark clothing and had covered their faces, one with a white hockey mask and the other with a black stocking cap and blue head covering with eye holes cut into it.

Upon entering the bank, they shouted at everyone to get down on the floor. Thomas struck one of the patrons, Donald McAfee, in the chest with his forearm, fist, and gun. McAfee suffered a contusion on his chest, and he was later hospitalized for examination when he complained of chest pains. Thomas subsequently took savings counselor Kamie Arnold with him to the bank vault and, after ordering her to open it, pressed his gun into the small of her back and pushed her into the jamb of the vault door. That shove resulted in bruises to Arnold's hand, arm, and her upper body. Arnold was unable to access the cash in the vault, however, prompting Thomas to assault her twice more with the gun: once he placed it against her head, threatening to kill her, and a second time he shoved the gun into her ribs, demanding more money. Thomas finally let Arnold be after bank teller Marjorie Creager screamed at him that the vault was inaccessible. In the end, Ledford and Thomas managed only to steal the money that was stored in the tellers' drawers.

Ledford and Thomas left the bank with $6,000 to $7,000 in cash, including some bait bills ($10 bills whose serial numbers were recorded by the bank). But their ill-gotten prosperity proved to be short-lived.

Car salesman Mark Sieger was sitting in his car watching the bank when the defendants emerged. His suspicions had been aroused moments earlier when the defendants cut him off at a traffic light

near the bank, almost hitting him. (As the car passed him, he noticed that one of the two occupants had braided hair.) Sieger had pulled his car over when he saw the men back their car up to the bank entrance and enter the bank, leaving the car doors open. He noticed one of the defendants put something over his head as they walked into the bank. By the time Thomas and Ledford returned to their car, Sieger had already dialed 911 on his cell phone to report his suspicion that a robbery was underway. He saw that one of the men was carrying a bag, the other a gun. As the defendants proceeded to flee the scene in their car, Sieger followed them in his own vehicle. Moments later he saw the defendants pull into the parking lot of an apartment complex, access the trunk of a beige- or champagne-colored Cadillac Seville, and then continue their flight in the Cadillac. He reported this to the 911 dispatcher, with whom he had remained on the line, and resumed pursuit. Sieger lost sight of the Cadillac briefly during the chase, but subsequently re-acquired it. (He recognized the car by its damaged driver's-side door.)

Meanwhile, the police had been apprised over the radio of what Sieger had observed. Detective Mack Page of the Fort Wayne Police Department spotted the Cadillac and pulled his vehicle behind it. Page activated his emergency lights and siren. Sieger subsequently reported to the 911 dispatcher that a police car had pulled in between his own car and the Cadillac he was following. This information was in turn broadcast by the police dispatcher, and Page heard the report. At this point, the Cadillac was stopped for a red traffic right. After Fort Wayne police officer Darryl Caudill and Indiana State Trooper Daniel Taylor pulled up and joined Page, the three officers stepped out of their cars, pointed their guns at the Cadillac, and ordered the occupants out of the vehicle. This took place eight minutes after the robbery occurred.

One at a time, Ledford and Thomas stepped out of the Seville with their arms raised. Page took custody of a gun that was tucked into Thomas' belt. The police placed the defendants under arrest, handcuffed them, and placed them in police cars. Sieger subsequently

identified Ledford and Thomas as the two men he had seen leaving the bank. He made that identification based on their clothes and Thomas' braided hair.

   With Thomas and Ledford in custody, the officers shifted their attention to the Cadillac. Purportedly for their own safety and to confirm that there was neither an additional suspect nor a hostage in the trunk of the car, the officers decided to inspect it. Fort Wayne police detective Wayne Kelly opened the trunk while Page, Taylor, and Caudill (and possibly other officers) stood by with their guns aimed at it. No person was discovered inside, and the trunk was closed after a moment. While the trunk was open, however, the officers collectively noticed that it contained a gun, a bag containing loose U.S. currency, a hockey mask, and a black knit cap. Kelly subsequently opened the trunk for a second time to show another officer where the second gun was and then re-closed it after being admonished by his superiors.

   The officers later obtained a search warrant for the car. In the passenger compartment of the Cadillac, the police discovered a black stocking cap with a pair of gloves and a blue head covering balled up inside of the cap, a black hooded sweatshirt, and a pair of white gloves. Within the trunk, they found a handgun, a knit cap with eye slits, a hockey mask, and a plastic bag containing $6,537 in cash, including $40 in bait money. A grand jury eventually indicted Ledford and Thomas on the robbery and firearm charges.

   Ledford and Thomas moved unsuccessfully to suppress the evidence seized from the trunk of the Cadillac. They argued that the police officers lacked the probable cause necessary to make their initial warrantless inspection of the trunk. But after an evidentiary hearing, Judge Lee concluded that the facts known to the officers by the time the trunk was opened supplied probable cause to believe that the trunk contained contraband and/or evidence of the bank robbery. Alternatively, the judge believed that the possibility that there might be a firearm and/or another suspect or hostage within the trunk justified the warrantless search. The contents of the

trunk were therefore admitted at trial, and as we have noted, a jury found both Ledford and Thomas guilty.

Judge Lee sentenced Ledford and Thomas to prison terms of 147 months, and 181 months, respectively. The pre-sentence reports indicated that the defendants had injured the bank employee and customer, rendering a two-level increase in the sentencing level appropriate pursuant to section 2B3.1(b)(3)(A) of the Sentencing Guidelines. The defendants objected to the enhancement, but after briefing and the presentation of testimony the court overruled the objections in a written opinion. Judge Lee sentenced each defendant at the high end of the sentencing range in view of the ruthless manner in which the men had treated the patrons and employees of the bank.

## II.
### A.  Motion to Suppress

Ledford and Thomas contend that the preliminary, warrantless inspection of the trunk of their automobile violated their rights under the Fourth Amendment. After an evidentiary hearing, Judge Lee concluded that the search was supported on either of two grounds: (1) the officers conducting the search had probable cause to believe that the trunk of the automobile contained evidence of the bank robbery; and (2) the possibility that there might be a firearm in the trunk of the car amounted to an exigent circumstance permitting the search, as did the possibility that an accomplice or hostage might be secreted in the trunk. R. 49 at 6-9. As we noted above, Detective Kelly actually opened the trunk of the car not once, but twice, before a search warrant was obtained. Judge Lee believed that probable cause supported the second as well as the first search of the trunk, id. at 10, but that in any event the second search yielded nothing that the first had not already revealed, rendering the fruits of the latter search admissible under the independent source rule, id. at 10-11 (citing Nix v. Williams, 467 U.S. 431, 104 S. Ct. 2501 (1984), and United States v. Gravens, 129 F.3d 974, 981 (7th Cir. 1997), cert. denied, 523 U.S. 1035, 118 S. Ct. 1333 (1998)). The defendants do not contest the judge's reasoning as to this second search. Therefore, we need only consider

whether the police were justified in opening the trunk of the defendants' car in the first instance. Our review is, of course, de novo. Ornelas v. United States, 517 U.S. 690, 116 S. Ct. 1657 (1996).

As all parties agree, a police officer may search an automobile without a warrant, so long as the search is supported by probable cause. See, e.g., Maryland v. Dyson, 527 U.S. 465, 466-67, 119 S. Ct. 2013, 2014 (1999) (per curiam); Wyoming v. Houghton, 526 U.S. 295, 300-01, 119 S. Ct. 1297, 1300-01 (1999). "Probable cause to search exists if, given the totality of the circumstances, there is 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Young, 38 F.3d 338, 340 (7th Cir. 1994), quoting Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332 (1983); United States v. Patterson, 65 F.3d 68, 71 (7th Cir. 1995), cert. denied, 516 U.S. 1061, 116 S. Ct. 740 (1996); see also Brinegar v. United States, 338 U.S. 160, 175-76, 69 S. Ct. 1302, 1310-11 (1949). An automobile search justified by probable cause may extend to any part of the vehicle in which evidence or contraband might be concealed, including, of course, the trunk of the car. See Houghton, 526 U.S. at 300-01, 119 S. Ct. at 1300-01; United States v. Ross, 456 U.S. 798, 820-21, 102 S. Ct. 2157, 2170-71 (1982).

Here, Judge Lee concluded that probable cause supported the decision to open and inspect the trunk of the defendant's automobile. In so concluding, the judge focused on what was known not to Detective Kelly, who did not testify at the suppression hearing, but to Detective Page, who was present at the scene and had his gun pointed at the trunk when Kelly opened it.

Detective Page knew the following from information disseminated by Police Dispatch: the Standard Federal Bank had been robbed at gunpoint; the robbers were two black males; the robbers had changed cars to a champagne-colored Cadillac; the robbers had opened the trunk of the Cadillac; a citizen was following the robbers from the robbery scene and relaying information by cell phone; the Cadillac was traveling in the same

direction and same road as the Cadillac Detective Page had spotted; the Cadillac he was following contained two black males; and at the time Detective Page activated his lights and siren, the citizen on the cell phone reported that a police car was now in between the Cadillac and the citizen. After stopping the Cadillac, Detective Page found that one of the suspects was in possession of a handgun.

R. 49 at 7-8. This information, Judge Lee reasoned, supplied the officers jointly with "plenty of probable cause" to believe that the trunk of the Cadillac contained the stolen money and other evidence of the robbery. Id. at 8.

The flaw in the district judge's rationale, as the defendants see it, lies in its focus on what Page knew, as opposed to Kelly. It was Kelly who opened the trunk of the car, Ledford and Thomas emphasize. What Page knew was therefore irrelevant, because he did not conduct the search. And because Kelly did not testify at the suppression hearing, the record tells us nothing about what he knew. The government responds that it is not Kelly's knowledge alone, but "the collective knowledge of the law enforcement officers" that the court must look to in determining whether probable cause existed to conduct the search. Government Br. 17; see, e.g., Tangwell v. Stuckey, 135 F.3d 510, 517 (7th Cir. 1998); United States v. Nafzger, 974 F.2d 906, 910-16 (7th Cir. 1992); United States v. Edwards, 885 F.3d 377, 382 (7th Cir. 1989); United States v. Rodriguez, 831 F.2d 162, 165-66 (7th Cir. 1987), cert. denied, 485 U.S. 965, 108 S. Ct. 1234 (1988). But according to Leford and Thomas, the collective knowledge of Page and Kelly's other colleagues will not validate the search absent some evidence that this knowledge was communicated to Kelly. See Edwards, 885 F.2d at 382.

We reject the defendants' argument, for two reasons. First, Ledford and Thomas have never asserted, until now, that the validity of the search turns on Kelly's knowledge alone. Although it was quite clear from the hearing below that the government was relying on the knowledge of Kelly's fellow officers to establish probable cause (see Tr. Feb. 27, 1998; see also R. 48 at 5-6), the defendants never suggested that what those officers

knew must be disregarded (see R. 45). Consequently, the district court was never asked to consider the extent to which Kelly was acting based on the collective knowledge of his colleagues. Second, the record makes clear that Kelly and the other officers jointly conducted the search of the automobile trunk. That it happened to be Kelly who actually opened the trunk does not necessarily signify that he alone conducted the search, rendering his knowledge the sole relevant subject of inquiry. On the contrary, the record reveals that as Kelly opened the trunk, Page and at least two other officers stood nearby with their guns pointed at the trunk, lest an accomplice be discovered inside. Moreover, Page and two other officers described what they observed inside the trunk once Kelly had opened it. These facts suggest that the officers were acting jointly in the search of the trunk, and indeed the defendants point to nothing that suggests otherwise. Because the search was a joint endeavor, the court may properly consider what Page and the other officers knew. See Edwards, 885 F.2d at 383 (imputing knowledge of one arresting officer to another, "because they made the arrest together"). Were it otherwise, the validity of such jointly-conducted searches might turn on the fortuity of which officer happened to open a trunk or door, notwithstanding the fact that he and his colleagues were acting in concert. As there is no dispute that the facts known to Page and the others supplied probable cause to search the trunk, Judge Lee was correct to conclude that probable cause supported the search.

   Having affirmed the probable cause determination, we need not consider whether exigent circumstances permitted the search or, alternatively, whether the evidence discovered within the trunk would inevitably have been discovered by way of an inventory search, as the government also asserts.

B. Sentencing Enhancement for Injury Inflicted by Gun

   In calculating the sentencing range for each defendant, the probation officer proposed, and the district court applied, a two-level enhancement pursuant to Guidelines section 2B3.1(b)(3)(A) because

the defendants had inflicted bodily injury upon one or more persons./1 Ledford and Thomas objected to the enhancement, but after taking testimony on the subject, the court concluded that both the bank customer, McAfee, and the savings counselor, Arnold, had suffered "bodily injuries" sufficiently serious to warrant the enhancement. In a written opinion, the court reasoned:

Ledford makes reference to the definition of bodily injury set forth in U.S.S.G. sec. 1B1.1, commentary B, identifying bodily injury as "any significant injury; e.g., an injury that is painful and obvious, or is of [a] type for which medical attention ordinarily would be sought." Memorandum at 1-2. However, Ledford proceeds to admit that McAfee received medical treatment. Id. at 2. For its part, the Government notes that McAfee, after being struck in the chest with a firearm, suffered chest pain and had to be transported to a hospital where he underwent several hours of tests. Memorandum at 3. Arnold's injuries included bruises from being struck with a gun in the head and rib area. Id. McAfee and Arnold, then, suffered injuries that were painful, obvious, and required medical attention, meeting the criteria in the definition Ledford himself offers. Besides this, the Government provides cases indicating that bumps and bruises and injuries that don't necessarily require medical attention can constitute bodily injury under U.S.S.G. sec. 2B3.1(b)(A) (United States v. Hamm, 13 F.3d 1126, 1127 (7th Cir. 1994)); so do slaps in the face (United States v. Greene, 964 F.2d 911, 912 (9th Cir. 1992)) and hitting someone's head or hip (United States v. Fitzwater, 896 F.2d 1009, 1012 (6th Cir. 1990). Memorandum at 3. The injuries which McAfee and Arnold suffered, then, fall well within the range of bodily injuries contemplated by U.S.S.G. sec. 2B3.1(b)(3)(A).

R. 75 at 5.

The defendants make two challenges to the bodily injury enhancement. Ledford and Thomas both argue in the first instance that the court made no findings of fact, linked to the record evidence, in support of the enhancement. See Fed. R. Crim. P. 32(c)(1). Thomas additionally argues that because the court employed a

six-level enhancement pursuant to Guidelines section 2B3.1(b)(2)(B) for the use of a firearm during the robbery in calculating his sentencing range (see n.1, supra), the two-level enhancement for the bodily injuries that he inflicted with the gun amounts to impermissible double-counting. We find no merit in either argument.

We believe that the district court's written opinion, the relevant portion of which we have recounted above, reflects findings adequate to sustain the bodily injury enhancement. It may be true, as the defendants suggest, that the district court judge did not make formal, explicit findings of fact and did not specifically cite the evidence that he chose to credit. That level of detail is not invariably required, however. See United States v. McKinney, 98 F.3d 974, 981-82 (7th Cir. 1996), cert. denied, 520 U.S. 1110, 117 S. Ct. 1119 (1997). There can be no doubt in this case that the court found the defendants responsible for assaulting both McAfee and Arnold, and further found that these assaults resulted in injuries that were sufficiently "significant" to justify imposition of the two-level enhancement under section 2B3.1(b)(3)(A). See R. 75 at 5; see also Ledford Sentencing Tr. 6, Thomas Sentencing Tr. 10. Further, although the court's opinion makes references to the assertions that the parties made in their briefs, we reject the defendants' suggestion that the court relied on the briefs alone in imposing the enhancement. The court obviously heard and weighed the evidence presented to it; its citation to the parties' briefs simply reflects a careful and balanced consideration of the parties' arguments. Finally, although the defendants posit that the court may have made findings that are inconsistent with the record evidence, we are satisfied that any discrepancies are immaterial. In particular, although the record does not indicate that Thomas actually struck Arnold in the head with his gun,/2 and although McAfee arguably was merely examined and observed when hospitalized, rather than "treated" (a point we do not reach), the record nonetheless establishes that McAfee was struck in the chest, and that Arnold was shoved against the vault door jamb, and that both were injured as a result--Arnold suffered

bruising on her side and arm, and McAfee suffered a contusion on his chest. Our precedents, as the district court recognized, make clear that such injuries are cognizable as significant bodily injuries for which the enhancement may be imposed. See United States v. Hargrove, 201 F.3d 966, 969-70 (7th Cir. 2000); United States v. Pandiello, 184 F.3d 682, 685-86 (7th Cir. 1999); Hamm, 13 F.3d at 1127-28.

Imposition of the bodily injury enhancement, in addition to the enhancement for "otherwise using" a firearm, does not amount to impermissible double-counting as Thomas argues. As our opinion in United States v. Swoape, 31 F.3d 482, 483 (7th Cir. 1994), recognizes, section 2B3.1(b)(2) focuses on the use of the firearm (or another dangerous weapon), without regard to whether or not injury results. Accord United States v. Perkins, 89 F.3d 303, 310 (6th Cir. 1996). By contrast, section 2B3.1(b)(3) is quite obviously concerned with the consequences of a defendant's conduct. See Swoape, 31 F.3d at 483. Thomas could have "used" his firearm in a way that injured no one. The fact that his use resulted in significant injuries to both McAfee and Arnold justifies the additional enhancement pursuant to the bodily injury guideline.

III.

We AFFIRM the defendants' convictions and sentences.

/1 Where, as here, the defendant has been convicted of using or carrying a firearm during and in relation to a crime of violence in violation of section 924(c) as well as the underlying crime of violence itself (in this case, bank robbery), section 2K2.4, Application Note 2, of the Guidelines calls upon the court to use two alternate means of calculating the sentencing range. The purpose of this exercise is to ensure that the defendant does not receive a more lenient sentence by virtue of his additional conviction under section 924(c) than he would if convicted of the underlying offense alone. See U.S.S.G. sec. 2K2.4 comment. (n.2) (1998); United States v. Patterson, 2000 WL 706020, at *9-*10 (7th Cir. June 1); United States v. Seawood, 172 F.3d 986, 990 (7th Cir. 1999).

In the absence of the section 924(c) conviction, the court would normally enhance the offense level for the underlying crime of violence based on the defendant's use of the firearm. If the defendant has also been convicted under section 924(c), however, these enhancements will not apply, because the statute mandates a 60-month consecutive sentence for the firearm conviction. See sec. 2K2.4(a) & comment. (n.2); Patterson, 2000 WL 706020, at *9. Yet, in a few cases, the enhancements would actually lengthen the defendant's sentence by more than the 60 months that the statute imposes. Id. This is what presents the possibility of a lesser sentence by virtue of the additional conviction under section 924(c). Id. at *10.

Thus, where the underlying crime is bank robbery, as it is here, the court must first ascertain what the offense level would be pursuant to the robbery guideline, section 2B3.1, exclusive of any of the firearms-related enhancements specified in subsections (b)(2)(A) through (F) of the guideline; the court then adds to the resulting sentencing range the mandatory sentence of 60 months specified by 18 U.S.C. sec. 924(c)(1)(A)(i). The court must next calculate what the offense level and resulting sentencing range would be under section 2B3.1 including any of the firearms-related enhancements called for in subsections (b)(2)(A) through (F); and in this calculation the mandatory sentence of 60 months required by section 924(c)(1)(A)(i) is disregarded. See sec. 2K2.4, comment. (n.2); United States v. Triplett, 104 F.3d 1074, 1081 (8th Cir.), cert. denied, 520 U.S. 1236, 117 S. Ct. 1837 (1997), and cert. denied, 520 U.S. 1270, 117 S. Ct. 2445 (1997).

If, as was true in this case, the first method of calculating the offense level results in a lower sentencing range than the second, then the court may depart upward in order to correct the disparity. sec. 2K2.4, comment. (n.2); Patterson, 2000 WL 706020, at *10. Here, the district court departed upward by one level in Ledford's case and by two levels in Thomas' case to achieve that end.

The bodily injury enhancement that we address here was among the enhancements that the district court applied when it calculated what the sentencing range for each defendant would be in the absence of the section 924(c) conviction. The enhancement therefore contributed to the district court's decision to depart upward. See R.75 at 6-10.

/2 The summary of the offense conduct set forth in the pre-sentence reports for both Ledford and

Thomas does state that Thomas struck Arnold in the head with the gun. Ledford PSR para. 10; Thomas PSR para. 10. That summary however, is based solely on the version of the offense that the prosecutor supplied to the probation officer. See Ledford PSR para. 5; Thomas PSR para. 5. However, what Ms. Arnold testified at trial, and what she told the probation officer, was that Thomas shoved a gun against her head, not that he necessarily pistol-whipped her. See Trial Tr. Aug. 11, 1998 at 71; Ledford PSR para. 17; Thomas PSR para. 17. Nonetheless, she did suffer bruising and pain to her head as a result. See Ledford PSR para.para. 10, 17; Thomas PSR para.para. 10, 17.