# United States Court of Appeals
## For the First Circuit

No. 01-1405

UNITED STATES OF AMERICA,

Appellee,

v.

Donald Cook,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Lipez, Circuit Judge
Coffin, Senior Circuit Judge
and Barbadoro,* District Judge

John H. LaChance, for appellant.
John A. Wortmann, Jr., Assistant United States Attorney, with whom James B. Farmer, United States Attorney, were on brief for the appellee.

January 18, 2002

*Of the District of New Hampshire, sitting by designation.

**BARBADORO,** <u>District Judge</u>**.**  A grand jury indicted Donald Cook for possession of crack cocaine with intent to distribute.  <u>See</u> 21 U.S.C. § 841(a)(1).  Cook subsequently moved to suppress the cocaine, arguing that the police seized it in violation of his Fourth Amendment rights.  The district court denied the motion because it determined that the cocaine was lawfully seized following an investigative stop authorized by <u>Terry</u> v. <u>Ohio</u>, 392 U.S. 1 (1968).  Ultimately, Cook was convicted of the lesser-included offense of possession of more than five grams of crack cocaine.  <u>See</u> 21 U.S.C. § 844.  He appeals his conviction, arguing that the court erred in denying his suppression motion.  We affirm.

I.

We construe the record in the light most favorable to the district court's ruling, drawing reasonable inferences in the government's favor.  <u>See</u> <u>United States</u> v. <u>McCarthy</u>, 77 F.3d 522, 525 (1st Cir. 1996); <u>see also</u> <u>United States</u> v. <u>Payton</u>, 615 F.2d 922, 923 (1st Cir. 1980).  The following recitation is derived from testimony given at the suppression hearing, as well as from affidavits submitted by two of the three arresting officers.

In the early morning hours of July 31, 1999, Boston Police Officers Craig Jones, Mark Freire, and John Conroy were patrolling the River Street area of Mattapan in an unmarked Crown Victoria sedan. Jones was driving. The officers were members of the Boston Police Department's Youth Violence Strike Force and were in plain clothes. Freire and Jones, who had 28 years of experience between them, were familiar with their locale and understood it to be a high-crime area in which the trafficking of cocaine and other drugs was common.

At approximately 1:30 a.m., the officers approached the Rolls Club, a Mattapan bar. All of the officers knew that members of a street gang, known as KOZ, frequented the Rolls Club. Jones knew that KOZ was heavily involved in drug trafficking and firearms offenses. Jones also understood that Cook, whom he had known for years, was a member of KOZ and had a criminal history that included convictions for drug trafficking, crimes of violence, and at least one firearms offense. Freire did not know Cook. Nor was he familiar with Cook's criminal history.

As the officers approached the club in their unmarked vehicle, Freire observed Cook and a second man facing each other with their hands extended as if they were about to exchange something. Before any exchange took place, the men looked at the approaching police vehicle and, apparently recognizing it as such, pulled their hands back and separated. Cook then entered the passenger side of a

nearby Ford Explorer, which was illegally parked with all four wheels on the sidewalk, and slid across behind the steering wheel. Jones first noticed Cook when he was inside the Explorer. After recognizing Cook, Jones stopped his vehicle and made eye contact with Cook, who looked alarmed. Both Freire and Jones thereafter saw Cook rise up out of his seat as if to place something in his pants or in the seat behind him. Jones identified Cook to his fellow officers and advised them that he thought Cook might have a gun. Freire, who had observed Cook's interaction with the unidentified man on the street, also was concerned that Cook had risen up out of his seat to hide drugs.

All three officers exited the police vehicle and approached the Explorer. Jones advanced toward the driver's side with his weapon drawn and asked Cook, through the open window, whether he had a gun. Cook replied that he did not. Jones then leaned in the driver's side window and, to the extent that he was able, patted Cook down. He then escorted Cook to the back of the Explorer and left him with Freire while he searched the vehicle for weapons. Freire, having noticed that Jones had not been able to conduct a complete pat-down of Cook, began patting him down. As he was doing so, he asked Cook whether he was concealing anything of which the officers should be aware. Cook responded that he had some marijuana.

Jones completed his search of the Explorer within a minute and returned to the back of the vehicle while Freire was completing the

-4-

pat-down. Jones asked Cook if he had placed something in his pants, and Cook replied that he had "a little bit of weed" on him. Jones was skeptical and told Cook so, commenting that he wasn't going to lock him up for "a little bit of weed." At that point, Cook admitted that he had "few hits of crack." Freire thereafter patted Cook down in the area of his buttocks and confirmed the presence of a hard object. The officers subsequently placed Cook under arrest and, after a brief scuffle, subdued him and transported him to a nearby police station. There, after being informed that the officers had the right to remove the object from his buttocks, Cook produced a bag containing approximately 16 grams of crack cocaine from the back of his shorts.

## II.

The law governing investigative stops is well understood. A law enforcement officer ordinarily may not stop someone and restrain his freedom to walk away unless the officer has a "reasonable and articulable suspicion of criminal activity." United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001). The reasonable suspicion test has been described as an intermediate standard requiring more than unfounded speculation but less than probable cause. See id. At a minimum, the officer must have a "particularized and objective basis" for suspicion. Ornelas v. United States, 517 U.S. 690, 696 (1996) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). When determining the legitimacy of an investigative stop, a court must undertake a

contextual analysis using common sense and a degree of deference to the expertise that informs a law enforcement officer's judgments about suspicious behavior.  See Chhien, 266 F.3d at 6.

An investigative stop also must "be reasonably related in scope to the circumstances which justified the interference in the first place."  Terry, 392 U.S. at 20.  If a law enforcement officer reasonably suspects criminal activity, he may briefly question the suspect about his concerns.  See Berkemer v. McCarty, 468 U.S. 420, 439 (1984); United States v. Jones, 187 F.3d 210, 218 (1st Cir. 1999).  If he has a reasonable basis to suspect that the subject of his inquiry may be armed, he also may frisk the suspect and undertake a limited search of the passenger compartment of any vehicle in which he is sitting.  See United States v. Scott, 270 F.3d 30, 41 (1st Cir. 2001).  Once again, context is vital in determining the permissible scope of an investigative stop.

Cook invokes these principles in challenging the district court's suppression ruling.  He first argues that the district court should have suppressed the cocaine because the officers lacked a sufficient basis to reasonably suspect that he was illegally carrying a firearm.  Alternatively, he contends that, even if the initial stop was justified, the officers should have released him immediately after they determined that he was not armed.  Both arguments depend upon the unarticulated assumption that the legitimacy of the stop must be

determined solely from Jones's perspective, without regard to observations made by other officers who jointly participated in the stop. Cook apparently reasons that because Jones (who first approached him) did not personally witness any behavior which suggested that Cook had recently participated in an attempted drug deal, the only possible justification for the stop was Jones's suspicion that Cook was illegally carrying a firearm. This assumption is incorrect.

As the Supreme Court has repeatedly noted, common sense and practical considerations must guide judgments about the reasonableness of searches and seizures. See United States v. Sharpe, 470 U.S. 675, 685 (1985) (investigative stops); Illinois v. Gates, 462 U.S. 213, 238 (1983) (probable cause determinations); Texas v. Brown, 460 U.S. 730, 735-36 (1983) (other exceptions to warrant requirement) (plurality opinion). Here, common sense suggests that, where law enforcement officers are jointly involved in executing an investigative stop, the knowledge of each officer should be imputed to others jointly involved in executing the stop. See United States v. Ledford, 218 F.3d 684, 689 (7th Cir. 2000) (applying principle in similar joint-search situation); see also United States v. Meade, 110 F.3d 190, 193-94 (1st Cir. 1997) (discussing "Fellow-Officer/Collective-Knowledge" Rule).

Investigative stops generally occur in a dynamic environment marked by the potential for violence. Officers who jointly make such stops rarely will have an opportunity to confer during the course of

the stop. Basing the legitimacy of the stop solely on what the officer who first approaches the suspect knows, rather than on the collective knowledge of all of the officers who participate directly in carrying out the stop, thus makes little sense from a practical standpoint. See Ledford, 218 F.3d at 689. Moreover, while we have recognized that a broad rendition of the collective knowledge principle could promote illegal searches, see Meade, 110 F.3d at 194 (expressing concern about applying the principle to impute the knowledge of an entire law enforcement agency to officers involved in executing a search), a far more limited application of the principle, one which takes into account only the knowledge of officers present at the scene and directly involved in effectuating a stop, is unlikely to encourage illegal police activity. Therefore, we will determine whether the stop at issue here was lawful by considering what both Jones and Freire knew about Cook's background and recent activities.

When we evaluate Cook's claims by considering the collective knowledge of all of the officers who participated in the stop, it becomes apparent that they had ample grounds to stop Cook and briefly question him about whether he had been involved in an attempted drug transaction. As we have noted, Freire testified that he observed Cook and another man in the midst of what looked to be some sort of exchange at 1:30 a.m. in an area known for narcotics trafficking; that the men broke off their interaction and separated when they saw the approaching

-8-

police officers; and that Cook then entered the illegally parked Explorer and appeared to be secreting some object in his pants or in the seat beneath him. While the information available to Freire does not irrefutably establish that Cook had been involved in an attempted drug deal, it provided a reasonable basis for his suspicions. No more is required to justify the officers' collective decision to briefly detain and question Cook. Cf. United States v. Stanley, 915 F.2d 54, 56-57 (1st Cir. 1990) (Terry stop reasonable where, just past midnight, defendant was sitting alone in his car in a high-crime area; appeared to be engaged in some purposeful though undefined drug-related activity; and appeared to hide something under his seat when he saw the officers approach). Moreover, because the officers were entitled to question Cook about his suspected participation in a drug deal, their right to detain him did not dissipate after they determined that he was not armed.[1]

---

[1] Although Cook does not press the point, we also note that the officers were entitled to frisk Cook and search his vehicle for weapons. When the officers encountered Cook apparently engaged in a drug transaction in a high crime area at 1:30 a.m., Jones knew that Cook was a member of a gang that was involved in drug trafficking and violence, and that Cook himself had a criminal record for engaging in drug trafficking, violent crimes and at least one firearms offense. The officers also knew that Cook appeared to be alarmed after he saw them, and rose up in his seat as if to conceal something in his pants or in the back of the vehicle. Under these circumstances, the officers had substantial reason to fear that Cook might be armed. See, e.g., Scott, 270 F.3d at 41; United States v. Gillard, 847 F.2d 21, 25 (1st Cir. 1988); United States v. Trullo, 809 F.2d 108, 113 (1st Cir. 1987).

III.

For the reasons stated, we <u>affirm</u> the conviction of defendant Donald Cook.