# United States Court of Appeals
## For the First Circuit

No. 02-1611

UNITED STATES,

Appellee,

v.

MICHAEL FIASCONARO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]
[Hon. David M. Cohen, U.S. Magistrate Judge]

Before

Selya, Circuit Judge,

Coffin and Bownes, Senior Circuit Judges.

Michael A. Cunniff for appellant.
Margaret D. McGaughey, Appellate Chief, with whom Paula D.
Silsby, United States Attorney, was on brief for appellee.

December 24, 2002

**BOWNES**, <u>Senior Circuit Judge</u>. The pivotal issue in this case is whether there was probable cause for the police to arrest the defendant-appellant, Michael Fiasconaro, search his motor vehicle, and seize from it $10,981 in United States currency and a cellular telephone. The defendant appeals from the district court's denial of his motion to suppress the currency, cellular telephone, and incriminating statements made after his arrest. We affirm the district court's order.[1]

## I. The Standard of Review

The standard of review that we apply is well delineated. We review the district court's findings of fact for clear error. See <u>United States</u> v. <u>Martinez-Molina</u>, 64 F.3d 719, 726 (1st Cir. 1995). Because the question of probable cause is a mixed question of law and fact, our ultimate determination is made <u>de novo</u>. See <u>United States</u> v. <u>Proctor</u>, 148 F.3d 39, 41 (1st Cir. 1998). We review the facts in the light favorable to the judgment; the denial of a suppression motion should be upheld if a reasonable interpretation of the record supports it. See <u>United States</u> v. <u>McCarthy</u>, 77 F.3d 522, 529 (1st Cir. 1996).

---

[1]The hearing on the facts was held before Magistrate Judge David M. Cohen. The district court approved and adopted the report of the magistrate judge which recommended that the motion to suppress be denied.

## II. __The Indictments__

Before we delve into the facts on probable cause, there is a question arising from the filing of a criminal complaint by Drug Enforcement Administration ("DEA") agent, Jay Stoothoff, on June 23, 2001. Count One of the complaint charged three persons, Murray D. Spaulding, William Albright and the defendant with conspiracy to possess and distribute cocaine. The magistrate judge struck "Albright from the complaint, finding no probable cause as to him." The criminal complaint was followed by a six-count indictment on July 18, 2001. Count One charged Murray D. Spaulding and the defendant with conspiring to possess and distribute "500 grams or more of a substance containing cocaine." The five additional counts charged Spaulding with intentionally distributing quantities of cocaine at various places and dates within the state of Maine. Spaulding entered into a plea bargain with the government and is no longer in the case.

On September 4, 2001, the defendant moved to suppress the cellular telephone and $10,981, as well as incriminating statements he made to the police after his arrest. The district court denied the motion and the defendant entered into a conditional guilty plea, reserving his right to appeal the denial of his motion to suppress. The defendant was sentenced on May 8, 2002, and this timely appeal followed.

## III.  The Facts

### A.  The Preliminary Events

As will become evident, the key player in this case is a confidential informant known only as CI 2182.  Case Agent William Deetjen, who had been a police officer for thirty-two years and worked for the Maine Drug Enforcement Agency ("MDEA") for twelve years, testified at the hearing on the defendant's motion to suppress that in January of 2001, a person was arrested on federal health care fraud and drug charges.  This person was addicted to the pain relievers Percocet and OxyContin and had information about drug dealing in the Sanford, Maine area.  After pleading guilty, he began to cooperate with the government and was debriefed on March 29, 2001.

Deetjen testified that the informant told him that Spaulding was selling cocaine in the town of Lyman, Maine, which is next to Sanford.  The informant told Deetjen the address of Spaulding's house and that he had various persons drive him twice a week to his supplier in Massachusetts from whom he bought cocaine in quarter pound packages.  The informant and Spaulding had met earlier but had lost contact until February 2001, when the informant and his sister went to Spaulding's house so his sister could buy cocaine.  According to Deetjen, the informant told him that Spaulding told the informant he could buy cocaine at any time.

After the informant's initial debriefing, Deetjen testified that he called Officer Todd Prough in Massachusetts, who was a member of the "cross border initiative," a task force of DEA and local law enforcement officers who were investigating the flow of drugs in and out of Massachusetts. Deetjen told Prough that he was investigating a person who had substantial amounts of cocaine in Maine and that this person's drug source appeared to be in Massachusetts.

Deetjen testified that to show his cooperation the informant made controlled purchases of cocaine from Spaulding at his home. The informant also made controlled purchases of crack cocaine from other people in the Sanford and Wells areas of Maine. Deetjen told Prough he considered the informant to be "very reliable" and was "the best cooperating defendant I have worked with." Deetjen further testified that the informant's information had resulted in federal indictments of five or six people, all of whom pled guilty. Because of Deetjen's assessment of the reliability of the informant, Prough also accepted the informant as reliable.

On April 5, 2001, the informant set up a controlled buy from Spaulding. He made a recorded call from the MDEA's office in Lyman to Spaulding who told him to come to his house. After searching the informant and his car, Deetjen gave the informant currency that had been photocopied, and equipped him with an

electronic listening device. The informant drove to Spaulding's house followed by MDEA agents. The agents overheard the sale of $250 worth of cocaine by Spaulding to the informant. The informant said he would want the same amount each week. Spaulding said that this would be no problem. The informant then drove to a prearranged meeting place where he delivered the cocaine he had bought to Deetjen.

Another controlled purchase using the same format took place on April 12, 2001. There was, however, additional conversation between the informant and Spaulding which was recorded and heard by the agents. The informant complained that Spaulding had used the informant's sister to provide transportation. Spaulding replied that she was a grown woman who could make her own decisions but said that if she agreed not to buy any more cocaine he would not use her again for transportation. The informant then said he would drive Spaulding himself. After being assured that the informant had a "legal car," Spaulding told the informant that the trip to and from Massachusetts took three hours. The groundwork had been laid for the informant to drive Spaulding to Spaulding's cocaine source. On June 5, 2001, a recorded telephone call to Spaulding was made. This call was to confirm that the informant would drive Spaulding to his Massachusetts source the next time Spaulding made the trip. The phone was answered by

Spaulding's girlfriend who told the informant that Spaulding had already left for Massachusetts.

Another recorded call was made the next day. The informant chided Spaulding for going to Massachusetts without him and not giving him a chance to make money. Spaulding told the informant that he made the trip when it was necessary and that he had tried to call the informant but could not reach him. Spaulding also agreed to a drug sale. The informant was wired and given money that had been photocopied. As usual, MDEA agents followed the informant to Spaulding's house.

There was a monitored conversation on Spaulding's porch between the informant, Spaulding's girlfriend and Spaulding. During the conversation Spaulding said he had to take his latest trip to Massachusetts alone because he could not contact anyone to drive him. The informant said that he would have liked to earn the money. There was then a discussion of the purchases of kilograms and half kilograms of cocaine. Spaulding said that half a kilogram cost him $10,000 and that the informant could buy it for $13,000. Spaulding said that his best week of drug sales made him a profit of $8,000. Spaulding sold the informant an ounce of cocaine for $1,000, which the informant subsequently turned over to MDEA agents. The last controlled buy was on June 20, 2001. Spaulding's girlfriend answered the recorded call to Spaulding's house and said that Spaulding had gone to Foxwoods casino. She told the informant

-7-

she had "between a half and three quarters." Deetjen said this meant that she had between one-half to three-quarters of an ounce of cocaine. The informant told her that he needed more and would wait for Spaulding. She replied that she had enough to last her for the meantime.

The informant was equipped with an electronic listening device by the MDEA agents, who followed him to Spaulding's house. When the informant arrived, Spaulding was there. The agents overhead the sale of an eighth of an ounce of cocaine to the informant. Deetjen, however, failed to activate the recorder, so there was no record of the conversations between Spaulding and the informant. After the informant returned to the MDEA office, Deetjen had him make a recorded call to Spaulding confirming the basis of the sale.

Deetjen and Prough testified that after each of the controlled buys, Deetjen called Prough and gave him all the details. It was Deetjen's opinion that the amounts of drugs involved were getting larger and that the source was located in either Lowell or Lawrence, Massachusetts. Prough evidently agreed with this analysis.

B.  **The Main Event**

After a series of recorded telephone calls between the informant to Spaulding or people at Spaulding's house, it was agreed that the informant would drive Spaulding to Massachusetts.

On June 2 there was a recorded conversation between the informant and Spaulding during which the following remarks were made by Spaulding. The informant told Spaulding that he had been to Portland and a buyer wanted three ounces of cocaine. Spaulding said, "got them right here." Spaulding then said, "I'm ready to go too. I need to dump these to go. My guy's waiting for me to come down right now."

Deetjen testified at the suppression hearing that the phrase "my guy" meant his cocaine source, and that the phrase "dump these" meant that he needed to sell the cocaine he had before driving to Massachusetts to buy more. Prough testified that usually drug dealers do not pay in advance for the drugs they buy, but instead sell the drugs they have and use the proceeds to pay their source.

Spaulding told the informant to meet him within a half an hour. The informant left Spaulding's house to change his clothes for the trip. Deetjen testified that he discussed the conversation with the informant and was told that Spaulding wanted him to drive Spaulding to Massachusetts to obtain cocaine. Deetjen relayed the information to Prough. He described the make and license plate of the informant's car, told Prough that the informant would be wired and asked for help in the surveillance. Deetjen left it to Prough to decide whether to arrest the source.

Agents of the MDEA inspected the informant's car and then wired it so the conversations between Spaulding and the informant could be overheard and recorded. Agents Kenneth Pike and Gerald Hamilton were assigned to follow the informant's car during the drive to Massachusetts. Shortly after the informant and Spaulding left for Massachusetts the transmitter in the informant's car was dislodged so Hamilton could hear nothing. When the informant's car stopped briefly at a Burger King and Spaulding went inside, Hamilton told the informant that the transmitter was not working and the informant got it fixed before they started up again. The remarks by Spaulding were incriminating to say the least. Spaulding identified his connection to the source and how the connection was paid. Spaulding also told the informant that he put property in other people's names so that it could not be seized.

Prough had a surveillance team assembled at a rest area on Route 95 South, just over the border in Massachusetts. He was in constant communication with the other agents and police officers involved. Methuen Police Detective Thomas Donovan, who was part of the Massachusetts surveillance team and had been informed of the type and license plate number of the informant's automobile, spotted the car traveling south on Route 95. In Peabody, the car left Route 95 for Route 1. At about 6:30 p.m., Hamilton, who was following the informant's vehicle, saw it turn into a parking lot before the Hilltop Restaurant and notified Prough. Hamilton then

lost sight of the car, but Prough, who was driving directly in front of it, and Donovan saw the car turn into the Border Café, a Mexican restaurant.

The tape of the wire transmission that then occurred was played at the suppression hearing. Spaulding told the informant that he might want to go somewhere else because he would have to wait a minute. Hamilton testified that he heard a door shut and heard someone get out of the car. Prough heard a radio report by Donovan from the other end of the parking lot that he saw Spaulding get out of the informant's car and go inside the Border Café. Donovan followed Spaulding into the restaurant and saw him look around, but he left without meeting anyone and got back into the informant's car. Hamilton heard Spaulding tell the informant to shut off his lights because "[h]e ain't here yet."

Both Hamilton and Prough overheard Spaulding get a cell phone from the car. Donovan saw the informant's car go to the back of the parking lot. Spaulding got out of the car, went to a wooden guardrail and began using the cellular phone. A short time later, Hamilton and Prough heard, over the transmitter, Spaulding return to the car and tell the informant, "the guy is on his way" and would be there in five minutes.

About fifteen minutes later, Donovan saw a green Honda Accord pull into the parking lot. He reported this to Prough. There were two white males in the Honda. The passenger had dark

hair and was nearly twice the size of the driver. At the hearing Donovan identified the driver as Michael Fiasconaro of Lynn, Massachusetts. Donovan testified that the Honda passed Spaulding who had gotten out of the informant's car and stopped in an access road between the parking lots and the exit. Donovan saw Spaulding walk over to the Honda, open the door and get into the rear passenger seat. The informant made a report to the same effect over the wire. Donovan testified that he saw Spaulding lean forward between the two front seats and talk to the occupants of the Honda, then get out and run back to the informant's car. Spaulding was in the Honda not more than forty seconds.

Prough testified that it was his opinion that, taking all of the circumstances into consideration, including the brevity of the encounter between Spaulding and the occupants of the Honda, that a drug deal had taken place. He believed that the Honda contained money, or drugs, or both.

Hamilton heard the informant say over the wire, "Okay, we're all set. We're taking off." Both Deetjen and Prough testified that this meant that the sale had been made and the informant and Spaulding were going back to Maine. The defendant's vehicle went in another direction. Prough radioed the police in Saugus, Massachusetts, and asked them to stop the defendant's car with a marked cruiser. This was done. The defendant and the passenger, William Albright, were immediately arrested. The car

was searched and the police seized $10,981 in currency, some of which was taken from the defendant's person, but most was found underneath the front passenger seat. The police also seized a cellular telephone that was connected to the car's cigarette lighter. The defendant admitted to the police that he owned the Honda, the money and the telephone.

As soon as the informant's car crossed over the border into Maine, MDEA agents stopped it, searched it and seized half a pound of cocaine.

We end this section of the opinion by noting that the record does not show either directly or indirectly that either Massachusetts or Maine was mentioned on the tapes of the recorded conversations. And the agents testifying at the hearing stated they had not seen any drugs or money change hands.

### IV. **The Defendant's Argument**

The defendant asserts that there was no probable cause for the police to arrest him, search his motor vehicle, and seize therefrom $10,981 and a cellular telephone. A warrantless arrest, like the one at issue here, must be based on probable cause. See United States v. Watson, 423 U.S. 411, 417 (1976); United States v. Link, 238 F.3d 106, 109 (1st Cir. 2001); United States v. DeMasi, 40 F.3d 1306, 1312 (1st Cir. 1994). Generally, if an arrest is not based on probable cause, then statements and evidence obtained as a result of the arrest are inadmissible. See Brown v.

Illinois, 422 U.S. 590, 601-02 (1975); Wong Sun v. United States, 371 U.S. 471, 484-86 (1963); United States v. Jorge, 865 F.2d 6, 9-10 (1st Cir. 1989).  In United States v. Santana, 895 F.2d 850, 852 (1st Cir. 1990), a case very similar to this one, probable cause was defined as follows:

> Probable cause exists when "'the facts and circumstances within [the police officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense.'"  United States v. Figueroa, 818 F.2d 1020, 1023 (1st Cir. 1987) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).  In other words, we consider the totality of the circumstances in evaluating whether the government demonstrated a sufficient "'[p]robability . . . of criminal activity,'" Id. at 1023-24 (quoting Illinois v. Gates, 462 U.S. 213, 235 (1983)). "Probability is the touchstone . . . .  [T]he government need not show 'the quantum of proof necessary to convict.'"  Id. at 1023 (quoting United States v. Miller, 589 F.2d 1117, 1128 (1st Cir. 1978)).

We have no trouble deciding that there was probable cause here.  In fact it overflowed.  Officer Prough's probable cause determination was supported by three pillars of evidence.  The first was the CI's statements to Officer Deetjen that the purpose of Spaulding's trip to Massachusetts was to purchase cocaine. The reliability of an informant is critical to our determination of whether that informant's statements can support a police officer's finding of probable cause.  See Link, 238 F.3d at 109-10; United States v. Khounsavanh, 113 F.3d 279, 284 (1st Cir. 1997) ("an

-14-

informant's 'veracity,' 'reliability' and 'basis of knowledge' are all highly relevant in determining the value of his report." (quoting Gates, 462 U.S. at 230)).  There is no doubt that Officer Deetjen had grounds for believing that the CI in this case was reliable.  In Officer Deetjen's estimation this informant was the best he had ever worked with:

> He was always on time, as directed, showed up where he was supposed to be as directed, was self-motivating as far as contacting people and . . . going on his own to visit people to set up things that we could later resurrect with phone calls.  Again, he was the best cooperating defendant I've ever worked with.

Deetjen testified that the informant's cooperation resulted in federal indictments of five or six persons, all of whom pleaded guilty.  See Link, 238 F.3d at 110.  Even more important, Deetjen was able to corroborate specific information provided by the CI.  See Gates, 462 U.S. at 244 ("Because an informant is right about some things, he is more probably right about other facts. . . .").  It was the CI, for example, who initially informed Deetjen about Spaulding's drug trafficking.  Deetjen was then able to confirm the CI's claims regarding Spaulding's drug trafficking via the controlled purchases.  After each of the controlled purchases, the CI provided Deetjen with details about the transaction; details which were later verified by electronic recordings or follow-up telephone calls from the CI to Spaulding.  In short, Officer Deetjen had a well founded belief that the informant was reliable.

-15-

The defendant attacks this first pillar of evidence by claiming that Officer Prough could not rely on the informant's statement that the purpose of Spaulding's trip to Massachusetts was to purchase cocaine. This argument requires some discussion. As we understand it, the defendant contends that when determining the existence of probable cause for an arrest, a district court may consider only the information possessed exclusively by the arresting officer and his on-scene colleagues, and not the collective knowledge possessed by all the officers involved in the investigation. Applying this theory to the case, the defendant argues that the arresting officer, Prough, did not have probable cause to make an arrest because he failed to make his own determination of the CI's reliability, and instead relied on an assessment of the informant's reliability made by Deetjen, who was the informant's handler, but was not at the scene of the defendant's arrest.

Controlling precedent directly contradicts the defendant's argument. In United States v. Taylor, 162 F.2d 12, 18 n.2 (1st Cir. 1998), this court found that information regarding an informant's reliability could be imputed from one desk officer to field officers cooperating in an investigation, even when the desk officer was not the confidant's usual handler, and therefore in less of a position to make judgments about the informant's reliability than Officer Deetjen.

The defendant has overstated the case he cites in support of his argument, United States v. Cook, 277 F.3d 82 (1st Cir. 2002). Cook does not stand for a hard and fast rule that a probable cause determination may include only information known to officers present at the scene of the arrest. Id. at 86. Rather, we read Cook to offer one fact-specific scenario of how the collective knowledge principle may be applied without promoting illegal searches. Id. Moreover, we have recognized applications of the collective knowledge principle that is broader than what the defendant now urges us to adopt; we have said, for example, that "the focus is upon the collective knowledge possessed by, and the aggregate information available to, all the officers involved in the investigation." See United States v. Winchenbach, 197 F.3d 548, 555 (1st Cir. 1999); see also Link, 238 F.3d at 109 (allowing collective knowledge of officers "involved" in arrest). Accordingly, Cook does not set the maximum reach of the collective knowledge principle as the defendant suggests in his brief. The district court, therefore, did not err in holding that Prough was allowed to rely, in part, on Deetjen's assessment that the informant was reliable.

The second pillar of evidence supporting Prough's probable cause determination was the incriminating statements made by Spaulding to the CI during the car ride from Maine to Massachusetts. During the conversation, Spaulding described his

-17-

connection to his drug source and how he was paid. Spaulding also told the informant how he put property in other people's names so that it would not be seized. These incriminating statements were transmitted in real-time to the officers involved in the investigation, including Prough.

The final evidentiary pillar consisted of the observations made by the police in the parking lot of the Mexican restaurant in Massachusetts. See United States v. Arvizu, 534 U.S. 266, 273 (2002) (officers permitted "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'") (quoting United States v. Cortez, 449 U.S. 411, 418 (1981); Martinez-Molina, 64 F.3d at 729. Once Spaulding and the informant arrived in the parking lot, Spaulding exited the car and used his cellular phone. Spaulding then reentered the car and Prough heard him say over the transmitter, "the guy is on his way." Shortly thereafter, a green Honda pulled into the parking lot. Spaulding was seen leaving the informant's car and going to the Honda. He was in the Honda not longer than forty seconds. While in the Honda, Spaulding was observed leaning between the front seats of the Honda, speaking briefly to the occupants and then quickly returning to the informant's car. Although none of the observing officers saw money or drugs change hands, it was the opinion of the officers that

based on their experience, there had been a purchase of drugs by Spaulding and what had transpired was typical of a drug transaction. In short, there consisted of ample probable cause to support the warrentless arrest of the defendant. The defendant's incriminating statements made after his arrest are therefore admissible. See United States v. Curry, 751 F.2d 442, 450 (1984). It is also well established that the defendant's lawful arrest permits the police to search his person and the passenger compartment of his vehicle. See New York v. Belton, 453 U.S. 454, 460 (1981); United States v. Doward, 41 F.3d 789, 792-93 (1st Cir. 1994); see also Winchenbach, 197 F.3d at 552 (1st Cir. 1999) ("[I]t is settled beyond peradventure that a search of an individual's person made incident to a valid arrest is itself valid, despite the absence of an arrest warrant."). Thus, the $10,981 and cellular telephone are admissible.

We also agree with the district court that there was an independent basis for upholding the search of the defendant's vehicle. In a case that goes back to prohibition days, the Supreme Court held that a warrantless search of an automobile based upon probable cause to believe that the vehicle contained evidence of a crime did not contravene the Fourth Amendment's warrant requirement. Carroll v. United States, 267 U.S. 132, 153 (1925). This ruling was reaffirmed in California v. Acevedo, 500 U.S. 565, 569 (1991). We have held to the same effect. See United States v.

-19-

Staula, 80 F.3d 596, 602 (1st Cir. 1995); Martinez-Molina, 64 F.3d at 730. The facts described above demonstrate that Officer Prough had probable cause to believe that the defendant's vehicle contained evidence of a drug transaction. Therefore, the search of the defendant's vehicle and seizure of his currency and cell phone were lawful, and the evidence admissible.

The defendant makes one final argument which merits discussion, albeit briefly. The defendant contends that the district court erred in finding probable cause as to him because it found that there was no probable cause to arrest Albright, the passenger in the defendant's car. The defendant argues that he and Albright were identically situated and therefore the same ruling should have been made as to him. Whether the district court was correct in its ruling as to Albright is not for us to decide in this case. Our inquiry here is limited to whether, at the time of the arrest, Officer Prough had probable cause to arrest the defendant and search his vehicle. See United States v. Reyes, 225 F.3d 71, 75 (1st Cir. 2000); United States v. Diallo, 29 F.3d 23, 26 (1st Cir. 1994). Having answered this question in the affirmative, we need not, and do not, delve into the district court's ruling regarding Albright.

The judgment of the district court is **affirmed**.