Rosanna MORELLI, Plaintiff,

v.

Steven WEBSTER, Defendant.

No. 07–CV–89–P–S.

United States District Court,
D. Maine.

May 19, 2008.

Barbara L. Goodwin, Murray, Plumb & Murray Zachary L. Heiden Maine Civil Liberties Union Portland, ME, for Plaintiff.

Edward R. Benjamin, Jr., Thompson & Bowie, Portland, ME, for Defendant.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

GEORGE Z. SINGAL, Chief Judge.

Before the Court is Defendant's Motion for Summary Judgment (Docket # 8). Through this Motion, Defendant Steven Webster seeks summary judgment on all counts alleged by Plaintiff Rosanna Morelli arising out of an incident with Defendant on the evening of March 3, 2006. After reviewing the parties' submissions, the Court GRANTS the Motion for the reasons explained below.

## I. STANDARD OF REVIEW

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law." *Nereida–Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 703 (1st Cir.1993).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004). Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir.1999) (citation and internal punctuation omitted); Fed.R.Civ.P. 56(e). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary

judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir.2001) (citation and internal punctuation omitted). Construing the record in the light most favorable to Plaintiff and with all reasonable inferences in her favor, the Court proceeds to set forth the background in this case.

## II. BACKGROUND

### A. The Parties

At all times relevant to this Motion, Defendant Steven Webster was employed as a police officer with the South Portland Police Department. Officer Webster graduated from the Maine Criminal Justice Academy in 1987 and has been employed by the South Portland Police Department since that time.[1] Officer Webster began working with the Maine Drug Enforcement Agency in 2000 and returned to the South Portland Police Department as an acting Sergeant in 2005. On March 3, 2006, he was serving as a Detective Sergeant and was fully certified by the State of Maine to function as a law enforcement officer for the City of South Portland.

In 2006, Plaintiff Rosanna Morelli was self-employed and working as an exotic dancer for private parties, with occasional calls for work through an escort service, Serena's Heaven on Earth ("Serena's"). Morelli sometimes used the alias "Vanessa." On March 3, 2006, Morelli was 53 years old.

### B. The Prostitution Sting

On March 3, 2006, Officer Webster was assisting the South Portland Police Department's Selective Enforcement Unit with a prostitution sting detail being conducted jointly with the Portland Police Department at the Merry Manor Hotel on Main Street in South Portland, Maine. Also on that date, South Portland Officer Peter McVane was working undercover and had assumed the role of a prospective prostitution customer. In that role, Officer McVane contacted several escort services that advertised in the *Phoenix* newspaper including Serena's. Officer McVane made arrangements for a female, who used the name "Vanessa," to come to his hotel room, Room 203.

Room 203 was outfitted with a surveillance camera, and video and audio from Room 203 were being transmitted to the room next door, Room 205, where it was being monitored. Officer Webster was in Room 205, along with other officers from both Portland and South Portland and Assistant District Attorney Mary Donovan.

### C. Plaintiff's Encounter with the Undercover Officer

On March 3, 2006, Morelli went to the Best Western Merry Manor Hotel in response to a call to Serena's to perform an exotic dance for a man she had spoken to on the phone who claimed to be staying in the hotel. She arrived at Room 203, and Officer Farris, in the observation room, recognized Morelli and advised the officers in the observation room who she was and his belief that she was a known prostitute.[2]

---

1. At both the Maine Criminal Justice Academy and at the South Portland Police Department, Officer Webster received training in the laws applicable to investigatory stops, arrest and the use of physical force in connection with arrests. Officer Webster's knowledge of the laws governing these activities comes from his education, training and over twenty

years of experience as a law enforcement officer.

2. The parties dispute whether Officer Webster learned of Morelli's identity at this point or later, after the altercation in the hallway. Nonetheless, the knowledge and information known to Officer Farris can be imputed to Officer Webster. *See, e.g., United States v.*

Morelli typically hugs her clients when she arrives to perform, and she hugged Officer McVane when he greeted her. She immediately felt uncomfortable. She sensed that McVane, who she later learned was a police officer, was nervous and acting strangely. In addition, she could see beer in the room, but did not smell any beer on Officer McVane's breath. Later in the encounter, Morelli's intuition told her that something was wrong and that Officer McVane was associated with law enforcement.

Morelli wore a heavy shearling coat to the hotel and placed it on the bed. Later, Morelli learned that the coat had partially blocked the camera that was set up to monitor the interaction.

Morelli and Officer McVane had discussed the price for Morelli's dancing services on the telephone prior to her arrival. When she arrived at the hotel room, Morelli repeated the price she had quoted, and Officer McVane placed the money on a counter; Morelli did not touch the money.

Morelli became more uncomfortable as she continued to speak to Officer McVane. She told him that she was only there to dance. At Officer McVane's request, she

began to take off her jeans, but as she was pulling them down, she became convinced that this was "a law enforcement set up and a waste of [her] time." (Declaration of Rosanna Morelli (Docket # 16–2) at ¶ 7.) She pulled her pants back up and, because he had told her repeatedly to take off her clothes, she sarcastically suggested to Officer McVane that he should take all of his clothing off instead.[3]

## D. The Altercation in the Hallway

As Morelli was preparing to leave, she told Officer McVane that he should give her twenty dollars for gas because he had wasted her time. There is no indication on the record at summary judgment that Officer McVane consented to Morelli taking any money. Morelli took $20.00 from the counter, picked up her coat, which she placed over her right arm, and left the hotel room. The officers in the observation room did not know how much money had been taken, and as she left Room 203, several police officers left the surveillance room. Upon entering the hallway, Morelli immediately saw a number of people in the hallway, who she acknowledged were police officers, and heard an officer state that

*Cook,* 277 F.3d 82, 86 (1st Cir.2002) ("where law enforcement officers are jointly involved in executing an investigative stop, the knowledge of each officer should be imputed to others jointly involved in executing the stop").

3. In responding to this statement in Plaintiff's Statement of Material Fact, Defendant failed to comply with Local Rule 56. Local Rule 56 provides that: "The reply statement shall admit, deny or qualify such additional facts...." Loc. R. 56(d). While the pronouns in Plaintiff's statement may be confusing at first glance, the affidavit on which the statement is based should have enabled Defendant to reply in compliance with the Local Rule. (*See* Pl.'s Resp. to Def.'s Statement of Material Facts Not in Dispute, and Pl.'s Statement of Additional Material Facts Not in Dispute ("Plaintiff's SMF") (Docket # 17) at 23 ¶ 7.)

Officer Webster asserts that when Officer McVane tried to question Morelli about the services that she was willing to provide, she insisted that Officer McVane completely disrobe. Officer Webster further argues that Morelli made this request because it was known that law enforcement officials would not totally disrobe while engaged in a prostitution sting operation. Morelli denies both assertions and claims that she sarcastically suggested that Officer McVane disrobe because he continuously asked her to do so. Morelli further states that she was never told that a way to identify undercover officers was to have them disrobe. Nonetheless, at her deposition, Morelli conceded that she did not believe police officers were allowed to completely remove their clothes as part of prostitution sting operations.

she had taken some of the money. She held out the bill, which was promptly taken by one of the officers. Morelli looked straight ahead and walked, and did not run, down the hallway.[4]

Officer Webster exited the observation room and proceeded down the hallway and stood in front of Morelli as she slowly approached him.[5] At the time, Officer Webster was in plain clothes but wearing a badge prominently displayed on his belt. Officer Webster is about a foot taller than Morelli and substantially heavier. He is approximately 6′2″ and in good physical shape and was accompanied by several plain clothes officers and at least one uniformed police officer. Officer Webster was aware that there were a number of families with children staying in the hotel in nearby rooms as he had seen children out in the hallway earlier that evening. In addition, at that point, Officer Webster believed Morelli still had the money from the South Portland Police Department that she had grabbed off the counter before leaving Room 203. This was a mistaken belief on Officer Webster's part since Morelli had returned the money immediately after leaving Room 203, and the money was in the possession of another officer by the time Officer Webster confronted Morelli in the hallway.

Morelli decided to try and circumvent Officer Webster in the hall in order to exit the hotel. Officer Webster blocked Morelli's path. Morelli stated that she was leaving the hotel, and Officer Webster responded that she was not going anywhere.[6] In attempting to move around Officer Webster, Morelli brushed against him because he was in close proximity to her. She had kept her right arm, which had her coat over it, stiff so that she could protect her personal space as she walked past Officer Webster. Then, Officer Webster reacted angrily. He told her that she was not going anywhere. He grabbed her right wrist, yanked her around, slammed her against the wall and held her pinned against the wall for several minutes. Officer Webster was the only person who tried to prevent Morelli from leaving the hotel.

Officer Webster then directed Morelli to return to Room 203, and he physically guided her back to the room. Although Officer Webster believed that she had not committed any act related to prostitution, he wanted to identify Morelli and investigate any connections to prostitution. Once Officer Webster knew that the money had been recovered, he told Morelli that he was not going to charge her with any crime and that if she would be respectful

4. Defendant failed to respond to this statement in Plaintiff's SMF. (*See* Plaintiff's SMF at 23 ¶ 12.) The parties disagree about Morelli's conduct after she left Room 203. Officer Webster asserts that Morelli was yelling and swearing in the hallway. Morelli denies this and states that she was quiet and peaceful as she was exiting the hotel.

5. The parties dispute whether Defendant initially stayed in the observation room or whether he was one of the first officers in the hallway.

6. The sequence of events surrounding the altercation is disputed by the parties. Specifically, Officer Webster claims that he entered

the hallway because he heard Morelli yelling and swearing. He further claims that when he entered the hallway, Morelli was trying to push past other officers and disobeying their orders to stop yelling. Officer Webster asserts that he stood in front of Morelli and placed his hand on her shoulder as he tried to speak with her. Then, Officer Webster claims Morelli shoved him with both of her hands, knocking him off balance. Officer Webster grabbed her upper arms to stop her from shoving him again. Nonetheless, for purposes of summary judgment, the Court will view the record in the light most favorable to Morelli and give her the benefit of all reasonable inferences in her favor. *Santoni*, 369 F.3d at 598.

of other guests and leave the hotel peacefully, she was free to go. Morelli was in Room 203 for several minutes being questioned prior to being told that she could leave.

Ultimately, Morelli was not arrested or charged with any crime as a result of her actions that evening.

### E. Plaintiff's Asserted Injuries

After the incident, Morelli had bruises on her arms from where Webster held her pinned against the wall. Her right hand, arm and shoulder were in severe pain. She returned to her home in Westbrook and called the South Portland Police Department. Morelli spoke with a Police Department dispatcher and told her what had happened. Morelli's hand and arm were swollen, and she experienced a lot of pain. The dispatcher offered to provide Morelli with an ambulance. Morelli went to the emergency room at about 11:30 p.m. on March 3, 2006.

Morelli has been unable to work as an exotic dancer since the incident on March 3, 2006. She continues to have pain in her right shoulder and arm and her lower back. The strength of the pain is worse at times than others, but it is never gone. The pain in her shoulder and back has become worse over time. Her range of motion is limited: she cannot lift her right arm over her head without pain, has to stand to write and cannot sleep on her right side.

### III. DISCUSSION

Counts I and II of Plaintiff's Complaint (Docket # 1) claim causes of action for violation of her Fourth Amendment right to be secure in her person against unreasonable seizures pursuant to section 42 U.S.C. § 1983 (Count I) and the Maine Civil Rights Act, 5 M.R.S.A. § 4681, et seq. (Count II). Section 1983 subjects individuals acting under color of state law to civil liability for infringing on the constitutional rights of a private person. 42 U.S.C. § 1983. The disposition of the federal claim is determinative of the claim under the Maine Civil Rights Act. See Forbis v. City of Portland, 270 F.Supp.2d 57, 61 (D.Me.2003). Plaintiff asserts that two components of her Fourth Amendment right were violated: the right to be secure against an unreasonable seizure of her person [7] and the right to not be subject to an unreasonable application of force in connection with that seizure. On summary judgment, Defendant claims that there were no violations of Plaintiff's rights and that, even if there were, he is entitled to qualified immunity.[8] The Court

---

7. Plaintiff claims that she was seized but does not articulate whether the seizure amounted to a de facto arrest requiring probable cause, or a lesser seizure, an investigative stop, requiring lesser reasonable suspicion. See United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997). Although the Court finds that Defendant had probable cause even if the seizure amounted to a de facto arrest, the Court will analyze the claim under the standards for both a de facto arrest and an investigative stop.

8. In her Complaint, Plaintiff states: "By virtue of his conduct, Sergeant Webster violated Ms. Morelli's rights under the Fourth and Fourteenth Amendments to the United States Constitution." (Docket # 1 at 4.) In the Motion for Summary Judgment, Defendant argues that any claim of "physical force and violence," must be analyzed under the Fourth Amendment pursuant to Graham v. Connor, 490 U.S. 386, 395–97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In response, Plaintiff states that "the reference is a common way of denoting that the rights in the federal constitution have been made applicable against the states through incorporation under the Fourteenth Amendment." (Pl.'s Opp'n to Def.'s Mot. for Summ. J., with Incorporated Mem. of Law (Docket # 16) at 5 n. 1.) Defendant did not file a reply in this case, and the Court will

52

will first address the claim of unreasonable seizure and then the claim of excessive force in connection with that seizure.

## A. The Seizure

■ The Fourth Amendment states that "the right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated, and no Warrant shall issue, but upon probable cause...." U.S. Const. amend. IV. Both a temporary detention and an arrest constitute a seizure within the purview of the Fourth Amendment and must therefore be reasonable under the circumstances. *See United States v. Romain,* 393 F.3d 63, 70–71 (1st Cir.2004). Nonetheless, "[t]here is no scientifically precise formula that enables courts to distinguish between investigatory stops, which can be justified by reasonable suspicion, and other detentions that the law deems sufficiently coercive to require probable cause—detentions that are sometimes called 'de facto arrests.'" *United States v. Zapata,* 18 F.3d 971, 975 (1st Cir.1994). The Court will analyze Plaintiff's claim under both a lesser temporary detention and the standard for a de facto arrest.

■ In *Terry v. Ohio,* the Supreme Court established that police officers may temporarily detain an individual, without probable cause, where the officer has a reasonable, articulable suspicion "that criminal activity may be afoot." 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *see also Romain,* 393 F.3d at 71 ("the showing required to meet [the standard for a temporary detention] is considerably less demanding than that required to make out probable cause"); *United States v. Young,* 105 F.3d 1, 6–7 (1st Cir.1997) ("With respect to investigative stops, the relevant question is not whether the police

assume that Plaintiff's clarification is suffi-

had probable cause to act, but instead whether the actions taken were reasonable under the circumstances."). To meet this standard, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Young,* 105 F.3d at 6–7 (internal citation and punctuation omitted).

■ The showing required for an arrest is greater than that required for a temporary detention. Ample case law has established that probable cause is needed not only to issue a warrant but also to effectuate a warrantless arrest. *Wilson v. City of Boston,* 421 F.3d 45, 54 (1st Cir.2005); *United States v. Meade,* 110 F.3d 190, 193 (1st Cir.1997). "Probable cause exists if 'the facts and circumstances within [a police officer's] knowledge and of which [the officer] had reasonably trustworthy information [are] sufficient in themselves to warrant a [person] of reasonable caution' to believe that a crime has been or is being committed." *Alexis v. McDonald's Restaurants of Massachusetts, Inc.,* 67 F.3d 341, 351 (1st Cir.1995) (quoting *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925)).

In determining whether an officer has reasonable suspicion or probable cause, the First Circuit has recognized that "reasonable suspicion or even probable cause can be established by the 'collective knowledge' or 'pooled knowledge' principle. Accordingly, the focus is upon the collective knowledge possessed by, and the aggregate information available to, all the officers involved in the investigation." *United States v. Barnes,* 506 F.3d 58, 62 (1st Cir.2007) (internal citations and punctuation omitted). The First Circuit has reasoned with regard to an investigatory stop that "[o]fficers who jointly make such

cient on the issue.

stops rarely will have an opportunity to confer during the course of the stop. Basing the legitimacy of the stop solely on what the officer who first approaches the suspect knows, rather than on the collective knowledge of all of the officers who participate directly in carrying out the stop, thus makes little sense from a practical standpoint." *United States v. Cook*, 277 F.3d 82, 86 (1st Cir.2002). Therefore, while Officer Webster is the officer who seized Morelli, the Court will more broadly consider the knowledge held by all the officers involved.

■ The circumstances of this case demonstrate that Defendant had reasonable suspicion to temporarily detain Plaintiff and probable cause to effectuate a de facto arrest. First, Defendant had "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed] [the] intrusion." *Young*, 105 F.3d at 6–7. Considering the aggregate information available to the officers involved, it was believed that Morelli was a known prostitute. *See Barnes*, 506 F.3d at 62. Furthermore, Morelli responded to a call for an exotic dancer, which she received from a business that was believed to be tied to local prostitution. She also asked Officer McVane to disrobe, a technique believed by law enforcement to be used by area prostitutes to ferret out undercover operations. Thus, the "specific and articulable facts" known to Officer Webster, and detailed above, reasonably warranted the intrusion of at least temporarily detaining Morelli to investigate any connections to prostitution. *See Young*, 105 F.3d at 7. Defendant had a reasonable suspicion that criminal activity, prostitution, was afoot, and the actions taken were reasonable under the circumstances.

Second, at the time Defendant seized Plaintiff, Officer McVane knew that Morelli had taken money from Room 203. Maine law permits an officer to arrest an individual without a warrant where the individual commits the crime of theft in the presence of the officer. *See* 17–A M.R.S.A. §§ 15, 353(1)(A). Considering the aggregate knowledge of the officers involved, the facts and circumstances within their knowledge would warrant a prudent person in believing that Morelli had committed theft and that Maine law empowered the officers to arrest her.

Further, as Morelli was proceeding towards Officer Webster, he told her to stop. She ignored the police command, and attempted to circumvent Officer Webster. In the course of attempting to go around Officer Webster, Morelli admitted to making physical contact with him. Officer Webster also knew that there were families with children staying in nearby rooms. At the time Officer Webster seized Morelli, he had knowledge of her connections to prostitution, theft of the police department's money and that she had disobeyed a police command to stop in the public corridor of a hotel. These facts and circumstances within Defendant's knowledge, based on reasonably trustworthy information, were sufficient to warrant a prudent person in believing that Morelli had committed or was committing a crime. *See Young*, 105 F.3d at 7. The Court finds that Defendant had probable cause to effectuate an arrest. Defendant's actions in temporarily detaining or making a de facto arrest comport with the Fourth Amendment's standard of reasonableness. There was no violation of Plaintiff's Fourth Amendment rights to be free from an unreasonable seizure, and Defendant is entitled to summary judgment with regard to this claim.[9]

9. Even if the Court found that Defendant lacked reasonable suspicion or probable

## B. Excessive Force

■ The Court next considered whether qualified immunity protects Defendant for the force he used against Morelli. The defense of qualified immunity protects state actors from liability under section 1983 for their good faith, but nevertheless mistaken, judgments. *Hatch v. Dep't for Children, Youth & Their Families*, 274 F.3d 12, 19–20 (1st Cir.2001). To determine whether a state official, such as Officer Webster, enjoys the protections of qualified immunity, the Court must engage in a three-step analysis in the proper sequence:

> (1) whether the claimant has alleged the deprivation of an actual constitutional right; (2) whether the right was clearly established at the time of the alleged action or inaction; and (3) if both of these questions are answered in the affirmative, whether an objectively reasonable official would have believed that the action taken violated that clearly established constitutional right.

*Starlight Sugar, Inc. v. Soto*, 253 F.3d 137, 141 (1st Cir.2001); *see also Buchanan v. Maine*, 469 F.3d 158, 167 (1st Cir.2006).

This three-step inquiry is dispositive of the claims under the Maine Civil Rights Act as well as the section 1983 claim. *See, e.g., Ms. K v. City of South Portland*, 407 F.Supp.2d 290, 298 n. 7 (D.Me.2006); *Jenness v. Nickerson*, 637 A.2d 1152, 1158 (Me.1994).

Under the first prong, the Court must ask "whether the claimant has alleged the deprivation of an actual constitutional right." *Starlight Sugar, Inc.*, 253 F.3d at 141. When the question of qualified immunity is before the Court on summary judgment, the First Circuit has stated that the court should ask "whether all the uncontested facts and any contested facts looked at in plaintiff's favor show a constitutional violation." *Buchanan*, 469 F.3d at 168. While "[t]he first prong inquiry will usually gain specificity at this . . . stage because of the ability to determine whether plaintiff's claim survives," "the level of specificity at which the first prong is analyzed may change depending on a given inquiry's utility in further elaborating the law." *Riverdale Mills Corp. v. Pimpare*, 392 F.3d 55, 62 (1st Cir.2004). Where, as here, a detailed inquiry will not aid in

cause, the Court would nonetheless find that Defendant is entitled to qualified immunity. Under the three pronged analysis established in *Starlight Sugar, Inc. v. Soto*, 253 F.3d 137, 141 (1st Cir.2001), the Court would find that the need for reasonable suspicion or probable cause was well established at the time of the incident and that an objectively reasonable official would believe that he had reasonable suspicion to detain and probable cause to arrest. The ample case law of the First Circuit gave the defendant fair warning that if he lacked probable cause or reasonable suspicion and nonetheless seized Plaintiff, the seizure would violate the Fourth Amendment and clearly established law. *See, e.g., Wong Sun v. United States*, 371 U.S. 471, 479, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Brown*, 500 F.3d 48, 56 (1st Cir. 2007) ("It is common ground that a warrantless arrest must be based on probable cause."); *Wilson*, 421 F.3d at 56 (finding that

the police lacked probable cause to arrest where the plaintiff was mistakenly swept up in "a mass arrest sting designed to capture a large number of persons with outstanding arrest warrants"); *United States v. Romain*, 393 F.3d 63, 70–71 (1st Cir.2004); *Valente v. Wallace*, 332 F.3d 30, 32 (1st Cir.2003) ("For a warrantless arrest, the Fourth Amendment is taken to require 'probable cause,' . . . . and the broad outlines of the concept are familiar."). Under the final prong, an objectively reasonable official would have believed that the action taken did not violate Plaintiff's clearly established Fourth Amendment rights. Indeed, a reasonable official would have believed that criminal activity, prostitution, was afoot, that Maine law permitted him to arrest Plaintiff and that he had probable cause to believe that Plaintiff had committed or was in the process of committing a crime. Defendant, therefore, would be entitled to qualified immunity.

elaborating the law, the Court will ask "whether at some abstract level the plaintiff[ ] [has] asserted a violation of constitutional rights...." *Buchanan*, 469 F.3d at 167 (internal punctuation and quotation omitted).

Plaintiff claims that after she left the hotel room, she returned any money that she had taken to an officer. She attempted to walk down the hallway to leave the hotel. Plaintiff alleges that Officer Webster confronted her in the hallway, attempted to block her from proceeding down the hallway and communicated to her that she needed to stop. Plaintiff then tried to pass Officer Webster and brushed against him, making physical contact with Officer Webster. Plaintiff claims that Officer Webster grabbed her wrist in a yanking manner, slammed her against the wall and held her there for several minutes.

 While recognizing that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it[,]" the force used must be reasonable to comport with the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In *Graham*, the Supreme Court cautioned that the reasonableness determination "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Plaintiff alleges that she had committed no crime, posed no threat to the officers or the public and was not resisting arrest or attempting to flee. Further, Plaintiff claims that these circumstances were known to Defendant when he applied the force. In short, Plaintiff alleges that Defendant used unreasonable force in effectuating the seizure in contravention of her Fourth Amendment rights. Plaintiff has alleged the deprivation of an actual constitutional right.

The second prong asks "whether the right was clearly established" at the time of the incident. *Starlight Sugar, Inc.*, 253 F.3d at 141. The concern under the second prong is notice. While the facts of any prior cases need not be identical, "the prior case law must give the officer reasonable notice that the specific conduct [he] is alleged to have committed in [the] litigation is unlawful." *Riverdale Mills Corp.*, 392 F.3d at 66. The Court concludes that Officer Webster had fair warning. First, it is well established that only reasonable force may be used to make an arrest. *See, e.g., Graham*, 490 U.S. at 396, 109 S.Ct. 1865; *Flowers v. Fiore*, 359 F.3d 24, 34 (1st Cir.2004); *Alexis*, 67 F.3d at 352. In addition, in *Alexis v. McDonald's Restaurants of Massachusetts, Inc.*, the First Circuit recognized that "not every push or shove will reach the level required for an excessive force claim," and nonetheless found that a police officer used excessive force. 67 F.3d at 352. In *Alexis*, the Plaintiff was charged with criminal trespass, a misdemeanor in Massachusetts, after being asked to leave a McDonald's Restaurant. *Id.* at 346. In effecting the arrest minutes later,

> without asking or directing Alexis to get up from the table, Leporati suddenly and violently grabbed and pulled her bodily [sic] from the booth and across the table, handcuffed her hands tightly behind her back, and, with the help of Officer Fuer, dragged her from the booth, bruising her legs in the process. Insisting that she was "not resisting arrest," Alexis asked the officers to allow her to walk out. Instead, they hoisted her by her elbows and carried her from the restaurant to the police car, where

Leporati pushed her into the car with the instruction, "Get your ass in there." *Id.* The First Circuit considered *Graham* and found excessive force because the crime was a misdemeanor, the Plaintiff posed no threat to anyone and did not attempt to evade or resist arrest. Plaintiff's allegations are materially similar to the situation in *Alexis.* *Alexis* and *Graham* provided Defendant with sufficient notice, and, therefore, the constitutional right at issue was clearly established at the time of the putative violation.

The third prong of the qualified immunity inquiry recognizes that "law enforcement officials will in some cases reasonably but mistakenly conclude that their conduct is lawful; in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable." *Buchanan,* 469 F.3d at 169 (internal punctuation omitted) (quoting *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523, (1987)). "Section 1983 actions 'frequently turn on the third prong of the qualified immunity inquiry, which channels the analysis from abstract principals to the specific facts of a given case.'" *Wilson,* 421 F.3d at 58 (quoting *Cox v. Hainey,* 391 F.3d 25, 31 (1 st Cir.2004)).

In determining whether an objectively reasonable police officer would have believed that the force used violated Plaintiff's clearly established right, the Court notes that the decisional law has long recognized that the right to arrest "necessarily carries with it the right to use some degree of physical coercion." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865. Further, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers" is unreasonable. *Id.* Instead, in evaluating what is reasonable, "the calculus ... must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. 1865.

■ An objectively reasonable official would not have believed that the force employed by Defendant violated Plaintiff's clearly established constitutional right to be free from excessive and unreasonable force. First, a reasonable official in Defendant's position could have believed that Plaintiff had committed theft of the police department's money. *See* 17–A M.R.S.A § 353(1)(A) (stating that "(1) A person is guilty of theft if: (A) The person obtains or exercises unauthorized control over the property of another with intent to deprive the other person of the property."). The Court finds that it was objectively reasonable for Defendant to employ force to enable the officers to seized Plaintiff and investigate whether she had indeed committed theft. In addition, Defendant had a reasonable suspicion that Plaintiff was connected to local prostitution, which is a more severe crime that would warrant a greater use of force to effectuate a seizure. *See Graham,* 490 U.S. at 396, 109 S.Ct. 1865.

Second, before Plaintiff attempted to circumvent Defendant, he told her to stop. Plaintiff did not stop; she disobeyed the command and attempted to leave the hotel. An objectively reasonable official could have believed that Plaintiff was attempting to evade any seizure by flight. *See id.* Further, Plaintiff made physical contact with Officer Webster, which showed the Defendant and the other officers present that she may pose a threat to the safety of the officers or others. *See id.* At that point in time, Defendant was also aware that the scene was unfolding in the limited confines of the corridor of a hotel, and that there were families and children nearby.

A reasonable officer in Defendant's position could have believed that physically stopping Plaintiff from leaving in order to detain her and speak to her in the privacy of the undercover room was a reasonable response to the situation. Considering the factors set forth in *Graham v. Connor*, the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight, *id.*, an objectively reasonable official could have believed that Plaintiff committed theft and was connected to prostitution, that she posed a threat to those around her and that she was actively evading seizure. In accord with the idea that some force is permissible and often necessary, Defendant could have reasonably believed that he was not violating Plaintiff's clearly established constitutional rights when he used some amount of force to seize her. *But see Alexis*, 67 F.3d at 352. The "gratuitously violent shove" is within the realm of conduct protected by qualified immunity. *See Saucier*, 533 U.S. at 208, 121 S.Ct. 2151. Summary judgment in favor of Defendant is appropriate on the claim of excessive force.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED (Docket # 8).

**SO ORDERED.**